JUSTICE WARNER
delivered the Opinion of the Court.
¶1 Robert Rose appeals from his 2003 convictions for aggravated kidnapping, assault with a weapon and assault on a peace officer. Rose was found guilty by a jury and judgment entered on June 6, 2003. He appealed and this Court remanded to the District Court to enter findings of fact and conclusions of law relating to the denial of Rose’s motion to dismiss for lack of a speedy trial.
¶2 After remand, the District Court held a two day evidentiary hearing on Rose’s speedy trial claim and subsequently entered findings of fact, conclusions of law and an order again denying his motion to dismiss for lack of speedy trial. We restate and consider the several issues Rose raises on appeal as follows:
¶3 1) Did the District Court err in denying Rose’s motion to dismiss for lack of a speedy trial?
¶4 2) Did the District Court err when it failed to hold a hearing on Rose’s complaints of ineffective assistance of counsel?
¶5 3) Did the District Court abuse its discretion in denying Rose’s motion for a new trial on the basis that the prosecutor’s statements during the State’s closing argument denied Rose a fair and impartial trial?
¶6 4) Was Rose’s trial counsel ineffective before she was removed, thus requiring a mistrial?
FACTUAL BACKGROUND
¶7 Rose was arrested on January 11, 2002, in Ravalli County following an incident in which he kidnapped a friend and co-worker, Jonathan Kirk Davies at knife point, badly cutting Davies when he tried to escape. Both Rose and Davies required medical attention. Later, upon his release from the hospital, Rose obtained pepper spray inadvertently left in the back of a patrol car and sprayed a law enforcement officer with it when in the Ravalli County Detention Facility.
¶8 The odyssey which occurred between Rose’s arrest on January 11, 2002, and his eventual trial which commenced 507 days later, on June 2, 2003, is summarized here as it relates to Rose’s claim that he was denied a speedy trial and his claim that he was denied a hearing to address his complaints about his lawyers.
¶9 The day after his arrest on January 11, a complaint was filed in the Ravalli County Justice Court charging Rose with aggravated kidnapping, assault with a weapon and assault on a peace officer. On *294 January 23, the State filed an information charging Rose with these same felony offenses in District Court.
¶10 On February 6, Rose made his initial appearance in District Court with court-appointed counsel, Larry Mansch. When asked if the defense needed further time to enter a plea, Mansch said, “We do, your Honor. We received about 160-some pages of discovery just the other day, and I know that Robert would like more time to review that, so we’d like to reappear next Wednesday, if I could, please.” On Wednesday, February 13, Rose appeared with counsel and entered not guilty pleas. The District Court set an Omnibus Hearing for March 6. At the Omnibus hearing, defense counsel noted Rose’s desire to move for a change of venue, and asked for additional time to pursue that option. The court gave the defense until March 27, 2002, to file the motion and stated: “Then it will be on the standard schedule.” The court set a status conference for April 10 and a settlement conference for April 18, 2002.
¶11 At the April 10 status hearing, Rose appeared with counsel and requested a continuance of the April 18 settlement conference. The State, represented by Ravalli County Attorney George H. Corn, objected. Corn predicted that Rose would later raise speedy trial problems and requested to proceed to trial with all haste. The District Court granted Rose’s motion to postpone the settlement conference until May 2, 2002.
¶12 On April 17, the District Court received the first of several letters from Rose complaining about his legal representation by Mansch. On April 18, the District Court scheduled a special hearing for April 24 to inquire about Rose’s complaints. The day before the hearing, the court received another letter from Rose, retracting his complaints against Mansch. Rose then appeared at the hearing on April 24 along with Mansch. He personally advised the court that he was satisfied with his counsel and there was no need for a further hearing on the matter.
¶13 On May 6, the court received another letter from Rose saying he regretted stating in court that he was satisfied with Mansch. On May 30, Mansch, who received Rose’s letters only after the court forwarded copies of them to him, wrote the court saying Rose’s letters to the court had not affected his representation and he was unwilling to step down from the case.
¶14 On June 6, Rose sent another letter to the court saying he was far from happy or satisfied with Mansch’s assistance. Rose also asked to represent himself pro se until he could retain private counsel or until he was appointed different counsel.
*295 ¶15 At a status hearing on June 12, Mansch told the court that Rose’s letters to the court had not compromised his representation of Rose. The State, again desiring the proper procedure be followed concerning Rose’s off again on again complaints about his lawyer and wishing to avoid speedy trial issues, asked the District Court to inquire about the letters written by Rose complaining about his lawyer, and noted that the trial was set to take place in less than two months. The judge asked Rose to state the reasons why he was dissatisfied with Mansch’s representation and explained that only then could the court determine if there was a substantial basis for Rose’s dissatisfaction. The judge explained that only if there was a valid basis for Rose’s complaints, would the court hold a full hearing to determine if Mansch should be replaced. The following exchange then took place:
Rose: Your Honor, I was wondering if we could maybe postpone this issue until a further time when we can meet with Mr. Corn and discuss some things, and if I still feel there’s a problem, could I address the Court at that time.
State:... I’ll rearrange my schedule and make sure we get it done. I think I want the record to reflect that this is done on Mr. Rose’s request. There could be a speedy trial issue, and I don’t want that to be on the State’s hook, so that’s my concern.
Court: So we’ll continue this hearing then -until June 19th at 9:00 on request of the Defendant.
¶16 On June 19, 2002, a status hearing was held at which Corn said that the State would press ahead and assumed the trial would be held on July 31. By that time, Rose had sent yet another letter to the court regarding Mansch’s representation. The State asked that Rose decide whether or not he wanted to proceed with Mr. Mansch, noting he signed no waiver of a speedy trial. The judge asked Rose if it was his wish to have a different attorney, Rose replied, ‘Yes, I think I would, because things have not run smoothly.”
¶17 The District Court specifically told Rose that if a new attorney was assigned to represent him, it would mean the trial would probably be postponed for weeks or even months. Mansch noted that Rose continuously complained about his representation and indicated his willingness to step aside. The District Court, noting it would save time, dismissed Mansch and appointed another attorney, Mr. Dustin Gahagan to represent Rose. The prosecutor, Mr. Corn, made no objection, noting the trial was still scheduled for July 29.
¶18 On July 11, 2002, the defense filed a motion to continue the July 29 trial. Attached to the motion was a handwritten waiver of speedy *296 trial signed by Rose. Reasons cited for requesting the continuance were counsel Gahagan had not been on the case very long, was extremely busy, and needed additional time to prepare the defense. Rose sent a letter to the District Court on July 13,2002, requesting postponement of the July trial saying he had hoped not to have to waive his right to a speedy trial but due to the lack of preparation by present counsel, he was left with no other option.
¶19 Six days later, Gahagan moved to substitute a different attorney as counsel for Rose due to the change in the public defender contract with Ravalli County. On July 22, 2002, the District Court appointed Kelli Sather as Rose’s attorney. The District Court granted Rose’s motion for further delay caused by his request for a different lawyer and reset the trial for November 18, 2002.
¶20 On October 25, 2002, less than one month before the November trial date, the defense filed a motion for a psychological exam. Three days later, the State filed a motion requesting that the trial proceed as scheduled on November 18. That same day, Rose appeared in court with Sather. Rose told the court he was interested in proceeding pro se but did not have a chance to talk to counsel about it enough yet. Sather reiterated the request for a psychological evaluation. The State reiterated its request that trial proceed as scheduled and any delay be attributed to the defense. The court advised Rose an evaluation would further delay trial and asked if he understood. Rose advised the court he understood. The court granted the motion for a psychological evaluation and advised a new trial date would be set after the evaluation was received. Rose requested to proceed pro se with consultation from Sather and the court postponed any decision on that matter until completion of the psychological examination.
¶21 On January 31, 2003, Rose wrote to the court requesting a hearing about his complaints about his attorney. On February 12, 2003, Rose appeared with Sather. The District Court inquired about both the status of the psychological examination and Rose’s complaints about his attorney. Sather stated the examination was finished and the doctor reported Rose was competent to proceed to trial. Sather further advised that Rose had not yet decided whether he wanted to rely on the psychological evaluation at trial, which would require him to disclose it to the State.
¶22 The court then inquired about Rose’s complaints with his representation by Sather as follows:
Court: ... Well, Mr. Rose, do you have a problem with Miss Sather’s representation? *297 Rose:... We met Monday, as she said, and I feel there’s been some confidence restored there, but as I mentioned in my complaint, I felt there’s been some due process violations and I would like to make mention of, if the Court would allow me time. If not we can-. Court: You can’t have an attorney and represent yourself at the same time, Mr. Rose. If you want to represent yourself, we can discuss that. If you want to be represented by an attorney, you need to deal with her and she will evaluate your claims and proceed with what she thinks is valid.
Rose: Okay.
Court: Is that clear? So are you dissatisfied with her representation or not?
Rose: I felt that I was. We met on Monday and we have started to address some issues and some concerns that I have had, and I feel if we are allowed to continue in those and spend time together and discuss my other defenses and gathering of evidence, I feel that that confidence-that the competence issue between her and I is fine. I do not have a complaint with her. I told her that. I felt it was a conflict rather with the State of Montana and Ravalli County and providing me with counsel that’s real busy, and that’s been the issue, and I feel that’s where my conflict lies.
Court: You’re never going to be appointed an attorney who has only you for a client.
Rose: I understand, Your Honor. I’ve never expected that from an attorney.
Court: These are busy people and that’s just part of the situation. Rose: I know, Your Honor.
Court: So right now you are not asking that your attorney be relieved?
Rose: No, I’m not, Your Honor.
Court: Okay.
¶23 Rose requested that trial be set.
Rose: But I do not want to make light of the complaints I had in the letter about representation. I feel I had adequate complaint. We have addressed issues on Monday, and if the Court would like to hear why I made those issues and put something on the record, I’m fine with that. I-but I would like to also say that her representation of me at this point, as of Monday, I feel is fine. We have discussed some due process issue that she’s agreed to look at with me, and those were my concerns that were being ignored. Court: Okay. Did you—
*298 State: Your Honor, I did. Thank you. I just wanted to remind the Court that these were the same complaints the Court has heard from Mr. Mansch last May, June and July. Mr. Mansch was ultimately relieved. The Court attempted to address Mr. Rose’s concerns, and it seems like we’re back to the same spot as eight months before. The matter has been set for trial twice. Witnesses have been subpoenaed, interviewed. I think that I’d respectfully request the Court impose some deadlines, not too quick, since we have witnesses out of town, but it sounds like Mr. Rose is heading down the same path. He’s going to attempt to fire present counsel, would be my prediction, so I would ask that the Court put some deadlines. It would take us probably a month to five weeks, just because we have witnesses that are out of the county that we have gone through the process of contacting and lining up before, but I think the deadlines are necessary, given the history of the case. Thank you, Judge.
Court: Are we ready to set this for trial, then?
Sather: Your Honor, yes, I believe we are. And if I could have until tomorrow to make a final decision, as I stated, with Mr. Rose about the disclosure of Dr. Davis’s report and whether we’re going to use that at trial as a defense or not. We’re still planning on going to trial, so yes, I think setting a trial date is fine at this point.
State: My only caveat to that is if they do use Dr. Davis’s, we may have to request some more time, ironically enough, to see if we agree with that and have that scrutinized by the State’s expert.
Court: The soonest we could set it would be probably in May.
Rose: Your Honor, may I make a response to the State’s accusations of frivolous matters pertaining to my complaint here today? The State responded to me-
Court: You know, I-
Rose: I would like some-
Court: No disrespect to Mr. Corn, but he’s saying what he has to say, and we just don’t have the time to get into this back and forth here, and it’s not going to do your case any good anyway.
¶24 Two days later, on February 14,2003, Sather filed notice of Rose’s intent to introduce evidence of his mental disease or defect at trial. On February 18, 2003, the court scheduled a jury trial to begin May 12.
¶25 On March 11, 2003, Rose wrote another letter directly to the judge, questioning the fairness of the presiding judge and requesting an inquiry into whether his speedy trial rights had been violated. *299 Three days later the court was forced to reset the jury trial for June 2, 2003, due to conflicts with the court’s calendar. Also on March 14, the State moved for a psychological examination of Rose by a doctor of the State’s choosing.
¶26 On March 19, 2003, Rose appeared in court with counsel. The judge advised that the State’s motion for a psychological examination was granted and Rose’s motion for new judge was denied. For the State’s expert to perform an evaluation, the State asked the defense to provide the supplemental materials relied upon by Dr. Davis in his evaluation of Rose. The defense failed to expeditiously provide that discovery.
¶27 On March 25, 2003, Rose again wrote directly to the court complaining of issues he felt his attorney was failing to address.
¶28 On March 28, Rose again sent a letter to the court attempting to make motions on his own behalf to protect his constitutional rights. This letter contained (1) a complaint about court-appointed counsel; (2) an invocation of his speedy trial rights; and (3) a motion for the court to take judicial notice of various evidentiary rules.
¶29 On April 8,2003, the State moved to bar evidence of Rose’s mental disease or defect because the defense failed to produce the discovery related to the evaluation after the court had ordered its production. The State attached to its motion a letter written by Rose to the court and Sather. The letter contained questions regarding his constitutional rights and criticizing County Attorney Corn for failing to protect his constitutional rights.
¶30 On April 16, 2003, Rose filed a pro se Petition for Writ of Habeas Corpus, raising issues regarding his representation and his speedy trial rights. Rose then appeared with counsel in court. The State made sure that Rose’s complaints about court-appointed counsel were addressed:
State: And thirdly your Honor, the third thing is Mr. Rose has been sending letters to the Court regarding dissatisfaction with counsel and the system in general. The State’s concern is that that may need to be addressed at some point before the trial. What I don’t want to happen is we have to reschedule three times. Mr. Rose has been through several attorneys, and if he intends to represent himself with Miss Sather as standby attorney or something, that needs to be sorted out before we get up to the eve of trial. I’m afraid, because there are quite a few subpoenas we have to send out, I would hate to see trial derailed again. And given the tenor of the letter that I received last week that I had to *300 send to the Court and Miss Sather, it particularly concerns me. He wrote me directly. I sent a copy to the Court and I sent one to Miss Sather, and that’s one reason that you may need to set something up so that that is all settled before you get closer to trial, Your Honor.
Court:... Now, Mr. Rose, are you currently dissatisfied with Miss Sather’s representation?
Rose: I felt that the-that we have a very serious lack of time together. I’ve prepared a handwritten writ of habeas corpus. I don’t know if the Court has jurisdiction here. I would like to ask if it’s frivolous to apply in this Court; if not, I would like to-I’ve got two copies, one for the Court and one for Mr. Corn, if that’s feasible to present today. If not, then I understand.
Court: Well, I couldn’t comment on it without seeing it. ... [Rose hands it to clerk who stamps it. Judge says he’ll look at it later.] Maybe what we ought to do here is have another attorney appointed to independently evaluate Mr. Rose’s complaints and make a report to the Court as to whether or not a hearing is necessary.... [Court determines that Ms. Brownlee has not been involved in the case.] I’ll appoint Miss Brownlee, just for the sole purpose of inquiring into your complaints about Miss Sather and determining, in her opinion, if further hearing is warranted on your concerns.
¶31 The District Court ordered attorney Sasha Brownlee to inquire into Rose’s complaints regarding his current counsel and to report to the court whether Rose’s complaints seemed substantial, warranting a hearing. The State meanwhile requested a hearing on the State’s motion for sanctions be continued without date until the State had a chance to evaluate a stack of materials that the defense provided 5 days prior.
¶32 On April 30, 2003, Rose appeared with counsel. The State inquired into the investigation by Brownlee to see if Rose’s complaints were valid. Rose responded:
Rose: May I have a minute, Your Honor? Miss Brownlee met with me Friday. We went over some things. She’s familiarizing herself with the rest of the matters that we discussed. She said she would get back with me, and so I’m just waiting to hear back from her on that. As I said before, I was dissatisfied at the time that counsel and I have had to get together and discuss matters of the case, and one of those would be that my right to privilege on some of this information is being discussed here today. I wanted some *301 arguments on that and counsel and I, I felt, need some more time to go over the matters of privilege as far as mental evaluation. There’s some parts of that that I don’t feel have been released in accord with-or have been released lawfully and it was a violation of my privilege. Whether that’s true or not, I would like some argument on it, and maybe have some time to look into that. Sather: Your Honor, I have looked into that somewhat, and if-I mean, I don’t mind setting a hearing on that if we want-at a later date if I find something or if Miss Brownlee finds something. I began to look into it in filing this response.
¶33 On May 23, 2003, ten days before they were to go to trial, Sather, on behalf of Rose, filed a motion to dismiss for a violation of speedy trial rights, arguing he suffered from a 498 day delay, triggering the speedy trial analysis. Rose alleged the entire delay was attributable to the State.
¶34 In chambers on June 2, 2003, the day of trial, defense requested a hearing on Rose’s speedy trial motion. After some argument, the District Court denied the request for a hearing and the motion to dismiss for lack of a speedy trial. On appeal, this Court remanded for a hearing on the speedy trial issue.
¶35 Trial was held as scheduled. The jury returned a verdict of guilty on all three counts. Rose was sentenced to Montana State Prison. As noted above, Rose appealed and we remanded for a hearing on the speedy trial issue. The District Court held a hearing and thereafter entered its findings of fact, conclusions of law and order denying Rose’s motion to dismiss.
STANDARDS OF REVIEW
¶36 We review the factual findings underlying a district court’s speedy trial ruling to determine whether those findings are clearly erroneous. State v. Ariegwe, 2007 MT 204, ¶ 119, 338 Mont. 442, ¶ 119, 167 P.3d 815, ¶ 119. Findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. Ariegwe, ¶ 119. We review de novo a district court’s determination of whether a speedy trial violation occurred because it is a conclusion of constitutional law. Ariegwe, ¶ 119; State v. Johnson, 2000 MT 180, ¶ 13, 300 Mont. 367, ¶ 13, 4 P.3d 654, ¶ 13.
¶37 Ariegwe was decided August 16,2007, which was after the District Court heard and entered its order denying Rose’s motion to dismiss for *302 lack of a speedy trial. The District Court utilized the now superseded analysis set forth in City of Billings v. Bruce, 1998 MT 186, 290 Mont. 148, 965 P.2d 866, to reach its decision. In other cases that were on appeal when a district court entered its decision before Ariegwe, we remanded for the district court to reconsider its orders applying the Ariegwe factors. See State v. Billman, 2008 MT 326, 346 Mont. 118, 194 P.3d 58; State v. Smith, 2008 MT 7, 341 Mont. 82, 176 P.3d 258; State v. Madplume, 2008 MT 37, 341 Mont. 321, 176 P.3d 1071; State v. Howard, 2008 MT 173, 343 Mont. 378, 184 P.3d 344. However, as this case was previously remanded for a hearing on Rose’s claim that he was denied a speedy trial, the factual record concerning Rose’s speedy trial motion is comprehensive and complete, and the District Court has made the necessary findings of fact for application of the Ariegwe analysis. A second remand for the District Court to again examine the record and reconsider its decision under Ariegwe would further delay a resolution for the parties involved. We conclude that judicial economy and fairness require we analyze the record and District Court’s findings of fact and reach the merits of the speedy trial argument. See ABC Collectors, Inc. v. Birnel, 2008 MT 35, ¶ 15, 341 Mont. 310, ¶ 15, 176 P.3d 1067, ¶ 15. Therefore, in this singular instance, we have carefully examined and utilized the record to consider the speedy trial issue in this case using the Ariegwe analysis.
¶38 Rose argues the judgment must be vacated because the District Court erred in not conducting a hearing to determine whether he was entitled to have his appointed counsel replaced. We will not overturn a district court’s decision on a request for the appointment of new counsel absent an abuse of discretion. State v. Gallagher, 1998 MT 70, ¶ 10, 288 Mont. 180, ¶ 10, 955 P.2d 1371, ¶ 10. The substitution of counsel is within a district court’s sound discretion. City of Billings v. Smith, 281 Mont. 133, 136, 932 P.2d 1058, 1060 (1997).
¶39 Rose argues that two segments of the State’s closing argument violated his right to a fair trial guaranteed to him by the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution. He makes this argument for the first time on appeal. We may discretionarily review claimed errors-even absent timely objection-which implicate a defendant's fundamental constitutional rights where failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. State v. Daniels, 2003 MT 247, ¶ 20, 317 Mont. 331, ¶ 20, 77 P.3d 224, ¶ 20.
*303 ¶40 Rose discharged his appointed counsel during the trial and proceeded by representing himself with his former counsel standing by. On appeal, he argues his counsel was ineffective before he discharged her. We review claims of ineffective assistance of counsel de novo because they present mixed questions of law and fact. State v. Parker, 2007 MT 243, ¶ 10, 339 Mont. 211, ¶ 10, 169 P.3d 380, ¶ 10; State v. Kougl, 2004 MT 243, ¶ 12, 323 Mont. 6, ¶ 12, 97 P.3d 1095, ¶ 12.
DISCUSSION
¶41 Issue 1. Did the District Court err in denying Rose’s motion to dismiss for lack of a speedy trial?
¶42 A court presented with a speedy trial claim analyzes and balances four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the accused’s responses to the delay; and, (4) prejudice to the accused. Ariegwe, ¶¶ 106-112.
¶43 On remand, the District Cotut held a two day speedy trial hearing which resulted in a 250 page transcript. There are also over 150 docket entries leading up to the June 2,2003, trial date, as well as transcripts from most of the pre-trial hearings. Also, the parties not only filed their original briefs, but filed supplemental briefs pertaining to the speedy trial issue. We examined the record and consider the Ariegwe factors as follows:
¶44 Factor One: Length of the Delay.

A. The Interval between Accusation and Trial.

¶45 The speedy trial clock begins to run at the earliest of arrest, indictment, or the filing of a complaint or information. Ariegwe, ¶ 42. Rose was arrested on January 11, 2002, in relation to the charges subsequently filed in District Court on January 23,2002. The trial date was June 2, 2003. The interval between the accusation and trial was 507 days, as found by the District Court on remand. This delay triggers further speedy trial analysis.

B. The Extent to which the Delay Stretches beyond the Trigger Date.

¶46 As a speedy trial analysis is triggered, we next consider the extent to which the delay, irrespective of fault for the delay stretches beyond the 200-day trigger date. The delay stretched 307 days beyond the trigger date. As a result, under Factor Two the State’s burden is to explain that its delay was not caused by bad faith, negligence or lack of diligence is increased substantially. Likewise, the presumption that pretrial delay prejudiced Rose is increased and the quantum of proof *304 expected of Rose under Factor Four is substantially decreased.
¶47 Factor Two: The reasons for the delay.
¶48 Under Factor Two, we determine whether the reasons for the delay weigh for or against the conclusion that Rose’s right to a speedy trial was violated. The more delay caused by the State for “unacceptable” reasons (e.g., lack of diligence or bad faith), the more likely the right was violated. The more delay caused by Rose for such reasons (e.g., to avoid being brought to trial), the less likely the right was violated. See Ariegwe, ¶¶ 71-72, 108-09.
¶49 On January 11, 2002, Rose made his first appearance in Justice Court and was later scheduled to be arraigned in District Court on February 6,2002. At his arraignment in District Court, Rose moved to continue for an additional week before he pled so his counsel could review discovery materials, which was granted. Thus, we attribute seven days of delay to Rose.
¶50 On February 13, Rose appeared with counsel and pleaded not guilty. An Omnibus hearing was set for March 6, 2002. At the Omnibus hearing Rose was unprepared and requested a further delay to investigate whether he should move for a change of venue. This delay was granted. The court gave Rose until March 27 to make his motion. Thus we attribute 21 days of delay to Rose. At this time the court also set a settlement conference for April 18.
¶51 On April 10, at a scheduled status hearing, Rose appeared with counsel and moved for a continuance of the April 18 settlement conference. The State objected, arguing it was necessary to press ahead in order to avoid speedy trial issues. However, the District Court granted Rose’s motion and set a new settlement conference for May 2. On April 25, the District Court set Rose’s trial for July 29. Thus, we attribute only 7 days of delay to Rose for the time between April 18 and April 25 when the District Court set the first trial date.
¶52 As noted in ¶¶ 15 and 16, the District Court held to the July 29 trial date, even though Rose began making complaints about his lawyer until July 11, when Rose moved to continue the trial and filed a waiver of his right to a speedy trial. Based on this motion, the trial was continued from July 29 until November 18, 2002. Thus, an additional 102 days of delay is attributed to Rose.
¶53 We note here that in most cases, once the defendant waived his right to a speedy trial, it is unnecessary to continue with an analysis of whether that right has been violated. However, in this case, the trial was not held as re-scheduled. Thus, we continue with the speedy trial analysis.
*305 ¶54 On October 25, 2002, Rose appeared in court with counsel and moved to continue the November 18 trial for the purpose of obtaining a psychological examination to determine if the defense of mental disease or defect should be raised.[1] At yet another hearing held on October 28, 2002, the State objected to any further delay. It was the State, not Rose, which was concerned with Rose’s right to a speedy trial. Rose said he understood that the exam would cause a further delay, but nevertheless desired to proceed with the mental examination. The District Court granted Rose’s motion. At this time the court held off on rescheduling the trial until the examination was completed. On February 18, 2003, after the defense received the results of the psychological examination, the court set trial for May 12, 2003. Thus, we attribute an additional 171 days to Rose for the time between November 18, 2002, and May 12, 2003.
¶55 On March 11, 2003, the trial was moved from May 12 to June 2, due to conflicts in the court’s calendar. On June 2, 2003, the trial commenced as scheduled.
¶56 Based on our analysis of the record, of the 507 days of delay we attribute 199 days to the State and 308 days to Rose, as detailed above in ¶¶ 48-54.
¶57 Institutional delay is delay that is inherent in the justice system and largely beyond the control of the justice system. This delay is attributed to the state but weighs less heavily against the State than delay caused by lack of diligence or bad faith in the balancing process because it is not delay that the State actively pursued or encouraged. State v. Atkins, 277 Mont. 103, 107, 920 P.2d 481, 483 (1996). In this case, all of the delay attributable to the State is institutional delay. The record clearly reflects the State objected to Rose’s requests for postponements from the beginning of the process. In this case it was the State, not Rose, concerned with protecting his right to a speedy trial.
¶58 To the contrary, Rose made complaints about his counsel and then withdrew those complaints, only to make the same complaints and again withdraw them. When a defendant makes requests for new counsel and then withdraws those requests only to renew those requests later, requiring a hearing and ultimately resulting in the withdrawal of counsel, the delay caused is appropriately attributed to the defendant. State v. Ellenburg, 2000 MT 232, ¶¶ 22-24, 301 Mont. *306 289, ¶¶ 22-24, 8 P.3d 801, ¶¶ 22-24; State v. Collier, 277 Mont. 46, 55-56, 919 P.2d 376, 382-83 (1997). Also, when the District Court inquired into Rose’s complaints and explained that, if they were substantial, a hearing would be conducted to decide if counsel should be replaced, Rose said he would proceed. When he again complained about his representation, the District Court carefully explained to Rose that if he wanted new counsel it would cause a delay. Rose accepted the delay and went so far to file a waiver of his right to a speedy trial. Then, after new counsel had time to prepare, and shortly before the trial was set, Rose filed a new request for further delay to advance a new defense, and then again complained about his lawyer’s representation. Based on this record, we conclude it was Rose who caused the greater portion of the delay in bringing this case to trial.
¶59 Factor Three: Response to the delay and assertion of speedy trial right.
¶60 A defendant must assert his speedy trial right before the case goes to trial in order to assert the right on appeal. The evaluation of Rose’s response to the delay must be based on surrounding circumstances, such as timeliness, persistence and sincerity of any objection to the delay, the reasons for any acquiescence in delay, and his pretrial conduct (as that conduct bears on the speedy trial right). See Ariegwe, ¶¶ 79-81. Conduct evidencing a desire to be brought to trial promptly weighs in Rose’s favor whereas conduct demonstrating a desire to avoid trial weighs against Rose in the overall balancing. See Ariegwe, ¶ 85.
¶61 Rose, in a half-hearted fashion, asserted his right to speedy trial in letters sent directly to the District Court on March 11 and 28,2003, and in his writ of habeas corpus filed on April 16, 2003. He was also advised on several occasions that his various motions would result in delay of trial, at which time he said he understood but still wanted to make his belated motions even though he knew they would cause delay. He finally filed a formal motion to dismiss for lack of a speedy trial on May 23, 2003, 497 days after he was arrested and 10 days before trial commenced.
¶62 The State’s response to the motions for delay indicates its desire to proceed to trial. The State was diligent in its attempt to bring the matter to trial.
¶63 The record in this case shows it was Rose who caused the delay over the objections of the prosecution. In sum, Factor Three tips the balance substantially against dismissal for lack of a speedy trial.
*307 ¶64 Factor Four: Prejudice to Rose.
¶65 A presumption the accused was prejudiced by a trial delay arises after 200 days. As the length of delay grows beyond 200 days, the prejudice intensifies. Ariegwe, ¶ 56. The court must weigh each party’s evidence (or lack thereof) in light of this intensifying presumption. Ariegwe, ¶¶ 49, 51. Specifically, as the delay gets longer, the accused’s duty to show prejudice decreases while the necessary showing by the State of no prejudice simultaneously increases.
¶66 The length of delay in this case is sufficient to raise the presumption of prejudice to the degree that the State must make a highly persuasive showing Rose was not prejudiced by the delay.
¶67 The determination of how much mental and physical discomfort a defendant is forced to endure because of delay between the time of his or her arrest and the trial is a fact intensive inquiry. The factual nature of this determination is a principal reason why the trial courts, who personally see and hear the defendant and other witnesses, should in the ordinary case consider whether a defendant’s right to a speedy trial has been violated. However, as noted above, this is not the ordinary case and this Court has a fully developed record which contains the trial judge’s findings of fact concerning the degree which Rose personally suffered.
¶68 First, Rose argues his pretrial incarceration was oppressive, noting his weight loss and his grievance forms about the food and temperature at the Ravalli County Detention Center. Next, he argues the delay of his trial caused him substantial anxiety and concern as demonstrated by his nail biting, his mental illness for which he sought treatment, his parents’ health problems and divorce, and his loss of work and contact with his daughter. These claims can be considered in light of the District Court’s findings of fact.
¶69 i. Oppressive Pretrial Incarceration.
¶70 In assessing whether the pretrial incarceration in a given case is “oppressive,” we consider all of the circumstances surrounding the incarceration. In Ariegwe, we identified a number of pertinent circumstances, including the duration of the incarceration, the complexity of the charged offense(s), any misconduct on the part of the accused directly related to the pretrial incarceration (e.g., a demonstrated likelihood to flee the jurisdiction of the court), whether the accused was incarcerated on a separate charge while awaiting trial on the instant charge, and the conditions of the incarceration, such as overcrowding and lack of recreational opportunities, adequate food, climate control, proper medical care, cleanliness, or legal research *308 capabilities. Ariegwe, ¶¶ 90-93.
¶71 We agree with the District Court’s findings of fact that although Rose’s pretrial incarceration was lengthy, neither its length nor the conditions of incarceration were unduly oppressive in light of the very serious offenses with which Rose was charged, Rose’s criminal history, and the potential danger Rose’s release would pose to others. In addition, there is substantial evidence in the record which supports the District Court’s determination Rose received sufficient medical treatment for a hip problem and other medical conditions while he was in detention, including medical appointments with a nurse and a physician, as well as treatment with various pain medications and anti-inflammatory drugs.
¶72 In regard to Rose’s complaints that his medical needs were not met, we also agree with the District Court and the United States District Court that the detention staff acted appropriately in their responses to grievances and were reasonably responsive to his mental health needs[2].
¶73 There is evidence the temperature in the jail was unsatisfactory for a short time. However, the problem was corrected. Considering the particular difficulties Rose suffered while incarcerated we do not conclude the District Court erred in finding that Rose’s time in jail was not so uncomfortable that it was “oppressive.”
¶74 ii. The Accused’s Anxiety and Concern.
¶75 “[T]he speedy trial guarantee serves ‘to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges,’ not to eliminate the disruption altogether.” Ariegwe ¶ 97 (quoting United States v. MacDonald, 456 U.S. 1, 8, 102 S. Ct. 1497, 1502 (1982). The question is whether the delay in bringing Rose to trial unduly prolonged the disruption or aggravated the anxiety and concern inherent in being accused of a crime. Ariegwe, ¶¶ 97, 147.
¶76 Although the length of delay is, in this instance, significant, the State demonstrated Rose was, to say the least, anxious and in mental turmoil before his arrest on these charges. While his incarceration pending trial may have increased his mental unrest, Rose suffered with anxiety and mental illness before his arrest and had refused treatment. In fact, it was while he was incarcerated on these charges he finally requested and received treatment.
¶77 Rose claims the delay exacerbated his anxiety and concern *309 because Rose’s mother underwent surgery and he was unable to be with her while she was ill. He also claims that being unable to spend more time with his teenage daughter caused additional anxiety and concern. We agree with the District Court while Mrs. Rose’s medical condition was undoubtedly a source of anxiety for Rose, there is no evidence this anxiety was any greater than would reasonably be expected for someone who has a family member with a serious medical condition. In regard to his daughter, Rose did not spend much time with her previously, but only claimed he was trying to form a relationship at the time of his arrest. The District Court concluded any anxiety and concern Rose suffered regarding these family relationships may have been caused by his incarceration, but were not unduly aggravated by the delay in his trial. We cannot conclude from the record that the District Court erred in this regard.
¶78 Hi. The Possibility that the Defense will be impaired.
¶79 The third interest protected in a consideration of prejudice to the defense caused by a delay in trial relates to the accused’s ability to present an effective defense. Ariegwe, ¶ 98. Impairment of one’s defense can be difficult to prove because time’s erosion of exculpatory evidence and testimony can rarely be shown. For this reason, affirmative proof of particularized prejudice is not essential to every speedy trial claim. Ariegwe, ¶ 99.
¶80 Rose argues the delay in bringing him to trial damaged his ability to present an effective defense because cell phone records disappeared, the truck in which the kidnapping took place was no longer available, and various witnesses were no longer available or could not remember certain details of the events in question.
¶81 However, in spite of the delay, the State was able to demonstrate Rose’s ability to present an effective defense was not demonstrably impaired. While incarcerated, Rose had access to at least three lawyers and a private investigator. While he did not always agree with the tactics and techniques of his attorneys, he had the ability to consult with them, advise them where evidence could be collected, and assist them in preparation for trial. With the use of his special investigator, Rose was able to secure and preserve any information or evidence which could have been exculpatory.
¶82 Rose’s defense, after he decided to forgo the defense of mental disease or defect, was based on justifiable use of force. There were only two persons present at the time of the altercation between himself and Mr. Davies. Considering the circumstances, there is no reason to believe that cell phone records he claims are missing or the absence of *310 his pickup would have provided evidence which would tend to exculpate him. Nor is there any showing that a witness forgot exculpatory evidence. Likewise, there is nothing in the record revealing what the witnesses Rose claims could not be located could have testified to, nor is there a showing of how their testimony could have been relevant to his defense.
¶83 The District Court concluded Rose was intimately familiar with the legal system and willing and able to assert every possible legal claim available. This weighs against him when deciding if his defense was impaired, which has been considered by many courts to be the most important factor in this analysis. Ariegwe, ¶ 98. See Barker v. Wingo, 407 U.S. 514, 532, 92 S. Ct. 2182, 2193 (1972); State v. Price, 2001 MT 212, ¶ 28, 306 Mont. 381, ¶ 28, 34 P.3d 112, ¶ 28.
¶84 iv. Factor Four Summary.
¶85 In summary, Rose was incarcerated 507 days. However, due to the severity of the crimes and his criminal history, the length of time he was incarcerated does not rise to the level of oppressive. While Rose suggests his medical treatment was not sufficient, we conclude that under these circumstances, he was not unduly prejudiced by lack of medical care. The anxiety Rose suffered existed before his arrest and was not overly aggravated by delay. The anxiety Rose suffered came from the nature of the offenses and the general jail experience, not the delay in bringing him to trial. While the delay may have caused some witnesses to forget some details, there is no evidence this hampered his defense. Nor is there any indication as to how any alleged missing evidence would have been used at trial.
¶86 Balancing.
¶87 We next determine whether Rose was deprived of his right to speedy trial in light of the facts of the case and the weight assigned to each of the four factors laid out above. “None of the factors is dispositive by itself; rather, the factors are related and must be considered together with such other circumstances as may be relevant.” Ariegwe, ¶ 153.
¶88 Factor One weighs in favor of Rose. The period between his arrest and his trial date is 507 days. This is indeed a substantial delay. However, considering the reasons for the delay under Factor Two, the length of the delay does not require that the charges be dismissed. The entire 199 days of delay attributable to the State is institutional delay. The remaining portion of the delay, 308 days, was not only caused by Rose, the State repeatedly objected to his motions for continuances. Thus, we must conclude that Rose’s right to a speedy trial was not *311 violated by the length of the delay.
¶89 Considering Rose’s desire to proceed to trial, after the greater portion of the delay was incurred, he asserted his right to speedy trial but then delayed the trial by subsequent motions. In sum, Rose’s actions were inconsistent with someone who desires to be brought to trial.
¶90 Finally, taking into consideration the crimes for which Rose was being held, the length of time incarcerated cannot be considered oppressive. The mental and physical problems Rose has were not unduly compounded by the amount of time he spent incarcerated. ¶91 Importantly, an examination of the record leads to the conclusion that Rose’s ability to defend himself was not impaired by the delay between his arrest and the trial.
¶92 The District Court did not abuse its discretion in denying Rose’s motion to dismiss for lack of a speedy trial.
¶93 Issue 2: Did the District Court err when it failed to hold a hearing on Rose’s complaints of ineffective assistance of counsel?
¶94 Rose alleges the District Court erred in failing to hold a hearing on his complaints of ineffective assistance of counsel. The right to counsel does not include the right to select an attorney of one’s own choosing or to require the particular attorney be appointed. State v. Pepperling, 177 Mont. 464, 472, 582 P.2d 341, 346 (1978).
¶95 We will not overturn a district court’s decision on a request for the appointment of new counsel absent an abuse of discretion. Gallagher, ¶ 10. The substitution of counsel is within the district court’s sound discretion. City of Billings, 281 Mont. at 136, 932 P.2d at 1060.
¶96 “A defendant is entitled to a hearing on the issue of ineffective assistance of counsel where the defendant presents a ‘seemingly substantial complaint’ about effective assistance.” City of Billings, 281 Mont. at 136, 932 P.2d at 1060 (quoting State v. Weaver, 276 Mont. 505, 511, 917 P.2d 437, 441 (1996)). The inquiry by the district court is sufficient if the district court considers the defendant’s factual complaints together with counsel’s specific explanations addressing the complaints. City of Billings, 281 Mont. at 136-37, 932 P.2d at 1060.
¶97 Rose sent letters directly to the judge regarding his concerns with his first court appointed attorney, Mansch. In response to the first letter, the judge questioned Rose about his current representation. Rose responded that the problems had been addressed, and no further conversation on the topic was needed:
Court: Mr. Rose, we had been here to address your concerns about your attorney. I’m now in possession of a letter received by the
*312 court yesterday where you appeared to indicate that you’ve worked through whatever concerns you have with Mr. Mansch here. Are you currently satisfied with his representation?
Rose: Yes. Your Honor, the complaints I made last week in the letter were some things that I felt that we needed to go over and hadn’t gone over yet, and we’ve started to go over those things and started to work on some of those things, so, you know, that’s what I was making reference to in the letter yesterday.
Court: So at this time then there’s no need to address the adequacy of your representation; is that correct?
Rose: Yes.
Court: Okay.
¶98 Later, upon receiving another complaint letter from Rose, the judge once again inquired into the matter and Rose responded he still had the same concerns and felt a new attorney was the best option. The judge, following the procedure suggested in Weaver, suggested a full hearing to determine if the complaints were so substantial that a different attorney was required. No hearing was held, however, as the lawyer said it would be more efficient for him to step aside. Rose and the District Court agreed.
¶99 Another lawyer, Gahagan, was appointed and represented Rose for about a month before he was replaced by Sather. In January of 2003 Rose began sending letters to the court directly complaining about Sather. On February 12, 2003, the court questioned Rose about his representation by Sather. Rose responded he had concerns with her, but they were beginning to work through those. Rose also explained to the comb he was upset with the system in general. Finally, Rose informed the District Court that he simply wanted his concerns to be heard and noted by the court. As the District Court inquired into Rose’s complaints and determined that he was in fact happy with counsel, there was no need to conduct a hearing to inquire further. See Gallagher, ¶ 15.
¶100 On April 16, 2003, after receiving more letters from Rose complaining about Sather, the District Court appointed another attorney, Sasha Brownlee, to inquire into Rose’s complaints.
¶101 After multiple meetings with both Rose and Sather, Brownlee filed a report with the court on May 16, 2003. Brownlee advised the District Court Rose made it clear to her he did not want Sather replaced; rather he wanted her to do things his way. Brownlee also advised the District Court that Sather’s communication with Rose was not deficient. Rose did not inform the District Court that Brownlee’s *313 conclusions were wrong, nor has he argued on appeal that her advice to the District Court was inaccurate.
¶102 When the District Court asked Rose what his problems with his lawyers were, he voiced no seemingly substantial complaints. When the District Court appointed yet another lawyer to inquire into Rose’s complaints about Sather, he told her he did not want her replaced. The District Court did not err in failing to hold a separate hearing to determine if Rose was being effectively represented by counsel. See Gallagher, ¶ 15.
¶103 Issue 3: Did the District Court abuse its discretion in denying Rose’s motion for a new trial on the basis that the prosecutor’s statements during the State’s closing argument denied Rose a fair and impartial trial?
¶104 Rose alleges two particular segments of the State’s closing argument violated his right to a fair trial guaranteed by the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution.
¶105 Rose first objects to the following comment made by the prosecutor near the end of his argument:
The real question is, and the one reason the defendant took the stand in this particular case and just told you so many untruthful things, is he doesn’t think you’ll hold him accountable. He doesn’t think that you, as members of the community, have the nerve to hold him accountable for his actions. He thinks that if he gets up and tells the big lie, that you’re too gullible, you’re too naive, you’re too nice to imagine that anyone would do that, and he hopes that by doing that, he will escape his responsibility.
¶106 A prosecutor invades the jury's province and engages in highly improper behavior when an attorney characterizes the defendant or witnesses as liars or offers personal opinions on a witness's credibility. State v. Racz, 2007 MT 244, ¶ 36, 339 Mont. 218, ¶ 36,168 P.3d 685, ¶ 36; State v. Hanson, 283 Mont. 316, 326, 940 P.2d 1166, 1172 (1997). However, to properly preserve an issue for appeal the defendant must make a timely objection or it is considered waived. Section 46-20-104 (2), MCA. Rose did not contemporaneously object to this statement and thus the objection was waived.[3] Having failed to object, Rose requests we employ our discretionary plain error review and reverse on this issue.
*314 ¶107 Our review of the closing arguments fails to persuade us the prosecutor's comments resulted in a manifest miscarriage of justice, undermined the trial’s fundamental fairness, or compromised the judicial process’s integrity. We conclude Rose failed to preserve this argument for appeal and we decline to exercise our discretionary plain error review and do not consider this matter further. See Racz, ¶ 36.
¶108 The second statement Rose objects to is about one of the weapons Rose used. In his closing argument the prosecutor said:
There’s no question these things are weapons. There’s just no question. We have got a utility knife — we all know this is the same sort of thing that the people that hijack the airplanes that ran into the World Trade Center, this is what they used.
¶109 Rose asserts on appeal that using this language 21 months after the September 11 terrorist attacks was an improper tactic which appealed to the patriotic emotions of the jury. In this instance the prosecutor referred to the type of knife supposedly used in the attacks of September 11 as an example of how a utility knife could be a weapon of which one could reasonably be afraid. Again, Rose did not object to this analogy and our review of the record does not persuade us that the prosecutor's comment resulted in a manifest miscarriage of justice, undermined the trial's fundamental fairness, or compromised the judicial process's integrity and we decline to exercise our discretionary plain error review. See Racz, ¶ 34; State v. Daniels, 2003 MT 247, ¶ 20, 317 Mont. 331, ¶ 20, 77 P.3d 224, ¶ 20.
¶110 Issue 4: Was Rose’s trial counsel ineffective before she was removed, thus requiring a mistrial?
¶111 A criminal defendant’s right to counsel is guaranteed by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. The right to counsel means the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984).
¶112 This Court has adopted the two-prong test first enunciated by the United States Supreme Court in Strickland for evaluating a defendant’s claim of ineffective assistance of counsel. See e.g. State v. Meza, 2006 MT 210, ¶ 27, 333 Mont. 305, ¶ 27, 143 P.3d 422, ¶ 27; State v. Jefferson, 2003 MT 90, ¶ 43, 315 Mont. 146, ¶ 43, 69 P.3d 641, ¶ 43; State v. Rose, 1998 MT 342, ¶ 12, 292 Mont. 350, ¶ 12, 972 P.2d 321, ¶ 12. A defendant who brings an ineffective assistance of counsel claim bears the burden of showing: (1) his counsel’s representation fell below an objective standard of reasonableness, and (2) his counsel’s *315 failure was prejudicial. Jefferson, ¶ 43 (citing Strickland, 466 U.S. at 668, 104 S. Ct. at 2052).
¶113 In regard to the first prong of the Strickland test-whether counsel’s performance was deficient-the inquiry must be “ ‘whether counsel’s assistance was reasonable considering all the circumstances.’ ” Whitlow v. State, 2008 MT 140, ¶ 14, 343 Mont. 90, ¶ 14, 183 P.3d 861, ¶ 14 (quoting Strickland, 466 U.S. at 688, 104 S. Ct. at 2065). Every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Whitlow, ¶ 15 (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065).
¶114 The pertinent inquiry, therefore, is not whether counsel acted because of ignorance or neglect but, rather, whether counsel’s conduct fell below an objective standard of reasonableness measured under prevailing professional norms under the surrounding circumstances. Whitlow, ¶ 20.
¶115 Under the second prong of Strickland, the defendant must show the existence of a reasonable probability that, but for counsel’s unprofessional conduct, the result of the proceedings would have been different. Jefferson, ¶ 53 (citing Strickland, 466 U.S. at 694, 104 S. Ct. at 2068). The prejudice inquiry focuses on whether counsel’s deficient performance renders the trial result unreliable or the proceedings fundamentally unfair. Jefferson, ¶ 53 (citing Strickland, 466 U.S. at 696, 104 S. Ct. at 2069).
¶116 Rose made no claim on appeal his counsel was ineffective by causing the delay between the time he was arrested and the time he was brought to trial.
¶117 Even though Rose discharged his counsel and represented himself, he claims on appeal Sather was ineffective before he discharged her because during voir dire she failed to either properly question, or attempt to remove for cause, a prospective juror who previously worked at the county attorney’s office. Rose asserts he is entitled to a new trial, relying on State v. LaMere, 2005 MT 118, 327 Mont. 115, 112 P.3d 1005, where defense counsel admitted he was negligent in reviewing a jury questionnaire, and allowed a mother of a paralegal who worked for the prosecutor’s office to sit on the jury.
¶118 A defendant is guaranteed an impartial jury by Article II, Section 24 of the Montana Constitution. LaMere, ¶ 7. Voir dire in a criminal proceeding requires adequate questioning to assure counsel's *316 ability to challenge a prospective juror for cause. LaMere, ¶ 15; State v. Herrman, 2003 MT 149, ¶ 23, 316 Mont. 198, ¶ 23, 70 P.3d 738, ¶ 23.
¶119 In this case, defense counsel has not admitted a mistake, as was the case in LaMere. In conducting voir dire, the prosecutor listed the witnesses that may be called to testify and then asked if any veniremen knew them. One remarked she knew one of the potential witnesses, a retired detective, because a couple of years previously she had held a temporary position in the county attorney’s office. She then stated she would not tend to favor one side or the other and could hear the evidence and decide the case. She stated she would be fair. In her voir dire for the defense, Sather confirmed this potential juror knew the named witness. The juror then stated she also knew the Roses, years previously.
¶ 120 There is nothing in the record that indicates this juror held any bias or prejudice. She had, years before, worked as a temporary employee in the county attorney’s office and was also acquainted with the defendant’s family. These facts do not indicate a bias or a prejudice. When there is nothing in the record to indicate a potential juror is biased, this Court does not presume she harbors a bias or prejudice. Cf. State v. Ibarra-Salas, 2007 MT 173, ¶ 22, 338 Mont. 191, ¶ 22, 164 P.3d 898, ¶ 22 (stating there is no presumption of juror bias for or against members of any particular racial or ethnic group). The juror, without coaching, affirmatively stated she could be fair, and would hear the evidence and decide the issues presented to her. As there is no record this particular juror had any bias or prejudice, we conclude counsel’s assistance did not fall below an objective standard of reasonableness measured under prevailing professional norms under the surrounding circumstances. Whitlow, ¶ 20.
¶121 Finally, Rose takes a shotgun approach and argues under the second prong of Strickland he probably would not have been convicted if his counsel inspected and tested blood evidence in Davies’ pickup where the offense occurred, because counsel did not object to evidence concerning his use ofmethamphetamine, and because counsel made no objection to a jury instruction that an intoxicated condition is not an excuse to commit a crime.
¶122 Rose argues the failure to preserve the pickup led to his inability to present blood evidence. Davies testified, and Rose does not deny, both he and Davies suffered bloody injuries in the cab of the pickup. How blood evidence could have been exculpatory remains a mystery.
*317 ¶123 Relating to methamphetamine use, after the trial had started, Rose decided to change his defense theory from lack of ability to form the intent to commit an offense because of mental disease or defect, to justifiable use of force. He then discharged his counsel, and proceeded pro se. When the State called the victim to testify, he said without objection, Rose was agitated and nervous the day of the offenses, that Rose told him that his girlfriend had spiked his hot chocolate with meth or speed, and that Rose wanted to go to a treatment center. Rose himself testified he was afraid and nervous that day, and also he would have gone to a treatment center. He also testified about his methamphetamine use. On appeal, Rose has not made a cogent argument as to why evidence of his methamphetamine use was error. Even if there were an error in introduction of such evidence, its introduction is attributable to Rose himself, not appointed counsel. Also, considering the evidence introduced, we see no error in giving the instruction concerning voluntary intoxication.
¶124 We conclude appointed counsel’s assistance was reasonable considering all the circumstances and did not fall below an objective standard of reasonableness measured under prevailing professional norms. Whitlow, ¶ 20.
¶125 Affirmed.
JUSTICES LEAPHART and RICE and DISTRICT COURT JUDGE WATTERS, sitting for JUSTICE MORRIS concur.

 Rose previously gave the State notice he might rely on the defense of justifiable use of force.

 Rose filed a petition for habeas corpus in the United States District Court, which made a factual determination he was not being ill-treated and denied the writ.

 By the time of closing arguments Rose had persuaded the District Court to allow him to represent himself with Sather as stand by counsel.