DA 09-0427

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 201

STATE OF MONTANA,

       Plaintiff and Appellee,

v.

JAMES ARTHUR COUTURE,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC 04-47
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           William F. Hooks, Attorney at Law, Helena, Montana

       For Appellee:

           Steve Bullock, Montana Attorney General, Matthew T. Cochenour,
Assistant Attorney General, Helena, Montana

           Mitch Young, Lake County Attorney, Polson, Montana

Submitted on Briefs:  April 8, 2010

Decided:  September 14, 2010

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 James A. Couture was convicted in the Twentieth Judicial District Court, Lake County, of deliberate homicide and two counts of tampering with or fabricating physical evidence. On appeal, he raises the sole issue of whether the District Court erred in denying his motion to dismiss for violation of his right to a speedy trial. We affirm.

## BACKGROUND

¶2 Couture shot and killed Daniel McLeod on or about May 2, 2004 (the factual basis of the deliberate homicide conviction). He then threw McLeod's body in the Flathead River and disposed of the gun used to kill McLeod (the factual bases of the tampering convictions). McLeod's body was found May 7; Couture was arrested May 17; and the State filed the Information May 24. Couture's trial began November 27, 2006, 924 days after his arrest. He remained in custody this entire time.

¶3 Couture's speedy trial claim is premised on the nearly 31-month delay in bringing him to trial. The record covering that period is extensive, due to a seemingly endless stream of continuances and delays over the two and a half years. Having carefully reviewed that procedural history, we conclude that Couture's right to a speedy trial was not violated. However, that being said, the glacial pace at which this case wended its way through the District Court is of serious concern, given that the right to a speedy trial is a fundamental constitutional right. U.S. Const. amends. VI, XIV; Mont. Const. art. II, § 24; *State v. Ariegwe*, 2007 MT 204, ¶ 20, 338 Mont. 442, 167 P.3d 815. Significantly, a variety of factors contributed to the delays, not the least of which was the failure of all involved—the court, the prosecutor, and the defense—to set and hold firm to deadlines.

2

Also encumbering the case's progression toward trial were the court's case-management policies, the State's loss of critical documents and its lack of diligence with some of its filings, and the disjointed and protracted manner in which defense preparations were conducted. Consequently, in order to identify the reasons for the delays and to attribute them to the proper party (Factor Two in the *Ariegwe* analysis), it is necessary to lay out the procedural history here in substantial detail, by referring to discrete blocks of delay.

### I.  Arrest to Arraignment (May 17 to Sept. 9, 2004; 115 days)

¶4     As noted, Couture was arrested on May 17, 2004. He made his initial appearance in Lake County Justice Court on May 18, and Larry Nistler was appointed to represent him on May 19. The court declined to set bail due to the nature of the charge (deliberate homicide), and Couture never filed a motion to set bail during the pretrial period. On May 27, the date set for arraignment in District Court, Nistler informed the court that he wanted to obtain a mental health evaluation of Couture before Couture entered his pleas. *See* § 46-14-202, MCA. The court agreed to order an evaluation through the Montana State Hospital, but noted that it did not want the case "to slip off the calendar." Nistler suggested a continuance of two weeks, and the court reset the arraignment for June 10.

¶5     A number of continuances followed—June 10 to July 1 to July 15 to August 12 to August 26 to September 9—all at Couture's request, and all related to his efforts to schedule and obtain the mental health evaluation and then discuss the report with counsel, review his rights, and decide on a plea. Ultimately, Couture was found fit to proceed, and on September 9, 2004, he entered pleas of not guilty to all charges. The court then proposed to set an accelerated omnibus hearing for September 23; however, due to the

3

court's policy on plea agreements (described below), Nistler stated that he would not be ready on that date. The court thus set the omnibus hearing for October 7.

## II. The District Court's Policies on Trial Dates and Plea Agreements

¶6 The Twentieth Judicial District Court has a trial setting procedure which, in conjunction with its plea agreement policy, arguably caused much of the pretrial delay in this case. Under the trial setting procedure, court staff first picks a "tentative" trial date that is 180 days after the defendant's initial appearance. The trial date does not become "firm," though, until the parties proceed through the omnibus hearing. Thus, if omnibus is held within the initial 180-day period, then the trial date falling 180 days after the initial appearance becomes the "firm" trial date. But if omnibus is not held within this period, then the 180-day trial date is discarded. In this event, the court requires the defendant to file a speedy trial waiver in order to extend the trial date beyond the 180-day period. Likewise, the court requires a waiver if the parties are not ready for the omnibus hearing by the 150th day, since by statute the court must hold the omnibus hearing "not less than 30 days before trial." Section 46-13-110(1), MCA. If the defendant refuses to provide a waiver, then the court leaves the trial date set at 180 days from the initial appearance. If a waiver is provided, then staff selects a new trial date. But again, the trial date is "tentative" and does not become "firm" until the parties proceed through the omnibus hearing. Consequently, a continuance of the omnibus hearing acts as a de facto continuance of the first trial setting.

¶7 The District Court's consideration of plea agreements, in turn, is controlled by the omnibus hearing. If a plea agreement is reached *before* the omnibus hearing, then the

4

court either will accept the plea agreement and be bound by it, or will allow the defendant to withdraw from the plea agreement if it is not acceptable to the court. But *after* the omnibus hearing, the court does not treat any subsequently negotiated plea agreement as binding on the court, and the defendant is not allowed to withdraw his guilty plea solely because the court imposes a sentence different from the one recommended in the plea agreement. As a result, there is a built-in incentive for a defendant to exhaust all possibilities of a plea agreement with the State *before* the omnibus hearing. As Nistler later explained at the speedy trial hearing, "once you go through omnibus, you have to advise your client that there are no guarantees anymore, now the plea agreement may not be worth the paper it's written on." Thus, in essence, "you've got a deadline at omnibus. Once you cross that threshold, you're going to trial." Nistler noted that he had seen some "disastrous consequences" when counsel proceeded through omnibus and then attempted to settle the case. For this reason, he stated, the court's policy "is something that I bear in mind in handling cases. Many times I may even get crosswise with the judges because I'll continue omnibuses multiple times. But until you rule out a plea agreement as an option, you are not serving your client well to go through omnibus hearing." The court, in turn, is "fairly liberal" about continuing omnibus hearings at the defendant's request.

¶8 The upshot of the District Court's policies on trial dates and plea agreements, therefore, is this: Until plea negotiations are exhausted, the defendant repeatedly seeks continuances of the omnibus hearing, and the court routinely grants them; and each continuance of the omnibus hearing, in turn, acts as a de facto continuance of the trial date. Bottom line: No firm trial date is set until the defendant and the State rule out the

5

possibility of a plea agreement. Of course, that could take months—or even years—since plea negotiations may be ongoing until discovery, investigations, testing, and interviews have all been completed. Hence, the District Court's policies, in tandem, theoretically may result in an indefinite postponement of the setting of the first trial date.

**III. Investigation and Plea Negotiations (Sept. 9, 2004, to Jan. 27, 2005; 140 days)**

¶9 As noted, the District Court set the omnibus hearing for October 7, 2004. On that date, Nistler informed the court that he and the prosecutor had just begun discussing a plea agreement. In addition, he stated that before he could advise the court on whether there was going to be a plea agreement, he needed an investigator to pursue some leads. He stated that he would be filing a motion to fund the investigator, and he suggested that the omnibus hearing be continued for a month. The prosecutor did not object, and the court reset the hearing for November 12.

¶10 On November 12, Nistler reported that he had had "tentative discussions" with the State concerning a plea offer. In addition, he reported that the individual he uses for major felony investigations had not been available until just recently due to a homicide investigation in Cascade County. Nistler requested a continuance of the omnibus hearing for another month. The prosecutor did not object, and the court reset the hearing for December 9.

¶11 On December 9, Nistler reported that the investigation was still in progress and that he was waiting for the State to reduce its plea proposal to writing. He requested two additional weeks. The court, however, stated that it was "concerned, obviously, that this case has been pending for a significant period of time." In response, Nistler contended

6

that much of the delay thus far was attributable to obtaining the psychological evaluation through the State Hospital prior to arraignment. In addition, the prosecutor stated that he did not object to another continuance, noting that the additional footwork needing to be done in a case of this sort (deliberate homicide) justified the additional time requested by the defense. The court continued the omnibus hearing to December 23, but stated that in the event of any further continuances, "there needs to be a serious discussion with regard to the defendant's right to a speedy trial in this matter."

¶12 On December 23, Nistler requested a four-week continuance for the investigator to complete his review of the case. He indicated that "this would be the last delay that would be needed." The court agreed to grant the continuance on the condition that Couture file a speedy trial waiver. The prosecutor noted that he would not object to a continuance, and the court then reset the omnibus hearing for January 20, 2005. Couture's waiver, filed January 3, did not specify the period covered. It simply recited that "additional time" was needed "to allow his attorney to fully review the evidence and interview witnesses in his case."

¶13 On January 20, Nistler reported that the prosecutor had made a tentative plea offer. Citing the court's plea agreement policy, he requested a one-week continuance so that the prosecutor could reduce the offer to writing and Nistler and Couture could then review it before the omnibus hearing and "make certain that that is his intent to go to trial with no offer on the table." A week later, on January 27, Nistler informed the court that Couture would not be accepting the State's offer and that "[w]e have exhausted the plea proposal process at this point." Thus far, **255 days** had passed since Couture's arrest.

**IV. New Defense Theory and New Counsel (Jan. 27 to June 16, 2005; 140 days)**

¶14    Although the plea proposal process had been exhausted, Nistler indicated that he could not move forward with the omnibus hearing because Couture had "just recently for the first time" asked him to pursue a mental state or mitigation defense. To that end, Nistler requested funding for an independent assessment by a private psychiatrist to ascertain whether such a defense was plausible. The court raised the issue of speedy trial, and so Nistler had Couture acknowledge on the record that the time spent investigating his mental state defense (which Nistler had estimated would take six to eight weeks) could not be held against the State for speedy trial purposes. The prosecutor indicated that he did not object, noting that "this being a homicide case, I am not going to stand in the way of the defendant exploring all possibilities." The court echoed this view and agreed to continue the hearing. A status conference was set for March 17.

¶15    At the status conference, Nistler stated that he had made four separate requests for a mental evaluation of Couture through Dr. William Stratford's office, but "apparently I picked the busiest psychiatrist in western Montana and accordingly I haven't been able to get his confirmation until yesterday." Nistler confirmed that Couture "has rejected any plea proposals, and it appears that the probability is great that it's headed to trial." But he contended that the separate mental health evaluation needed to be completed before they could proceed with the omnibus hearing. He explained that the evaluation was necessary in order to review any potential defenses in the case and also to determine Couture's fitness to proceed. Regarding the latter point, Nistler asserted that Couture had "deteriorated" since the previous evaluation by the State Hospital. He thus requested a

8

continuance of one month, to which the prosecutor did not object. The court reset the matter for April 14.

¶16 On April 14, Nistler again noted that Couture "did not wish to accept the plea proposals from the State and wanted this matter to proceed to trial," where "the primary defense would be a mental defense." However, Dr. Stratford had not yet issued his final report on Couture. Therefore, Nistler suggested a two-week continuance, to which the prosecutor did not object, and the court accordingly set the omnibus hearing for April 28. But on April 28, and again on May 5, Nistler obtained further continuances because Dr. Stratford still had not issued his report. In both instances, the court pointed out that a trial date of June 13 was available, and the court proposed to set trial for that date, which meant that the omnibus hearing needed to be held in May. *See* § 46-13-110(1), MCA. But Nistler maintained that he could not proceed to omnibus until he had received and reviewed Dr. Stratford's report. The court continued the matter to May 19.

¶17 In the interim, the court received a letter from Couture on May 10 requesting a hearing to seek new counsel. The court considered this request at the May 19 hearing, at which time Nistler and Couture explained the basis of Couture's complaint. In summary, Couture felt that Nistler had not been diligent in preparing a defense, and he believed that Nistler could not provide effective representation due to his heavy caseload. Couture also was dissatisfied with the findings and assistance they had received from the investigator and the psychiatrist. Moreover, Couture and Nistler disagreed on strategy and whether the case should go to trial. Nistler stated that they were at a "fundamental impasse" in that Couture did not want to seek a plea agreement and instead wished to proceed to trial,

9

whereas Nistler, the investigator, and the psychiatrist "feel that there is nothing we can do that's significant to assist him at the trial of the case." Lastly, Couture was frustrated that he did not have copies of all discovery, which he wanted to study in order to assist in his defense. Given these circumstances, Nistler concluded that they had reached a point where Couture did not trust him, and Couture insisted that he wanted counsel "with not such a heavy case load to help me." The court cautioned Couture that appointing new counsel and giving that person time to get up to speed would result in delay, which would be attributable to him. Couture acknowledged this and subsequently filed a speedy trial waiver, which again did not specify the period covered except to say that it was for "additional time, to allow the Court to appoint him new counsel."

¶18 The District Court appointed Rebecca Dupuis on June 13. At a status conference held June 16, Dupuis stated that she and Couture had met briefly and agreed to request an omnibus hearing in August. In addition, she noted that Couture had told her "to take as much time as I need" in preparing his defense and that he understood such delay would be attributable to him for speedy trial purposes. The prosecutor did not object to setting the omnibus hearing for August 11 but noted that the family of the victim had been "extremely distraught over the delays in this case" and that, for this reason, he likely would be objecting to any further delays. At this point (June 16, 2005), **395 days** had passed since Couture's arrest, and **280 days** had passed since he entered his not guilty pleas. No trial date had been set, and the parties had not yet gone through the omnibus hearing, which is supposed to occur "[w]ithin a reasonable time following the entry of a not guilty plea but not less than 30 days before trial." Section 46-13-110(1), MCA.

10

## V. Discovery/Suppression Issue, Act I; Omnibus Hearing; and First Trial Setting

### (June 16 to Oct. 27, 2005; 133 days)

¶19    In the interim between the June 16 conference and the August 11 hearing, Dupuis reviewed the case file transferred to her by Nistler and saw that Nistler had sent a letter to the Lake County Attorney on May 20, 2004, requesting discovery.  The Lake County Attorney's Office, which has an open-file policy, provided the defense with a copy of its file on Couture.  But in reading through the reports of the detectives who had investigated the case, Dupuis realized that certain discoverable items were not contained in the County Attorney's file and had not otherwise been provided.  Most of these items, it turns out, had been in the possession of the Lake County Sheriff's Office since May and June of 2004.  Thus, Dupuis filed a motion for discovery in which she requested the immediate production of, among other things:  the May 17, 2004 application for search warrant, as well as the search warrant issued based on that application, pursuant to which Couture's residence had been searched; copies of tape-recorded police interviews with witnesses; the autopsy report prepared by the State Crime Lab; and duplicates from the negatives of various photographs taken in the course of the investigation and autopsy.  The District Court issued an order directing the prosecutor to make the requested materials available.  However, when not all of the items were forthcoming, Dupuis filed a motion to compel discovery and for sanctions under § 46-15-329, MCA.  She asked the court to suppress any and all evidence that flowed from the May 17, 2004 search warrant.

¶20    At the scheduled omnibus hearing on August 11, the prosecution and the defense stated that they were not prepared to proceed due to the foregoing discovery issue.  The

11

court therefore reset the hearing for September 1. In the meantime, the prosecutor filed an objection to the motion for sanctions. He explained that after Dupuis filed her initial motion for discovery, most of the requested items were located at the Lake County Sheriff's Office or at the State Crime Lab but that, "through oversight," he had failed to ensure that those items were provided to the defense. Consequently, on receiving the motion to compel discovery and for sanctions, the prosecutor arranged for delivery of all the requested discovery, with one exception: the application for search warrant and the search warrant, neither of which could be located. The prosecutor explained that the lead detective on the case had become ill and unable to work at the Sheriff's Office and, thus, had taken some files home to work on them there. Later, in February 2005, the detective succumbed to his illness and died without returning to the Sheriff's Office. As a result, "the Couture file was not compiled and stored in the manner that he normally prepared such cases." Following the defense's discovery request, officers searched the detective's home but were unable to locate the search warrant or the application.

¶21    At the outset of the September 1 hearing, the District Court granted the motion to compel discovery and then turned to the issue of sanctions. By this date, the defense had received all the requested discovery except the search warrant application and the search warrant. Thus, while noting "significant concerns" over the discovery issue, the court chose not to impose sanctions on the State with regard to the items which had been provided, although they were tardy. As for the search warrant application and the search warrant, however, the court decided to treat Dupuis' motion for sanctions as a motion to suppress all evidence obtained or generated as a result of the May 17, 2004 search.

12

Furthermore, reasoning that "we can't get to omnibus until we can get a resolution of the motion to suppress on this matter," the court continued the omnibus hearing and ordered the prosecution to file an initial brief on the suppression issue, followed by a response brief from the defense. The court also noted that it was "concerned about the fact that the defendant is incarcerated" and that a "potential trial date" of October 24 was available. The court thus set a suppression/omnibus hearing for September 8. But Dupuis thereafter filed a motion, in which the prosecutor concurred, stating that they needed more time to submit briefs and prepare for the hearing. She also filed a speedy trial waiver, signed by Couture, covering the period of September 8 to the hearing. The court then reset the hearing for September 22.

¶22    The State filed its brief on September 21, which obviously left the defense without adequate time to file its response. Thus, the court again continued the hearing, and this time imposed deadlines: October 5 for the defense's response, October 24 for the State's reply, and October 27 for the omnibus hearing. Once the parties' briefing was complete, the court quickly issued its decision on October 26, thus eliminating the suppression issue as a ground for further delaying omnibus. In summary, the court observed that it could not review the sufficiency of the search warrant application because no record exists of the application, the search warrant, or the information given to the magistrate who made the initial probable cause determination—all of which the State had admittedly lost. The court concluded that "[t]he record, evidence, argument and State's legal authority are woefully insufficient," and the court therefore suppressed "[t]he evidence obtained from the May 17, 2004 search warrant and application."

13

¶23 The next day (October 27), the court and the parties proceeded, at long last, with the omnibus hearing—nearly 14 months after Couture's arraignment. Notably, Dupuis gave notice that Couture would *not* be relying on a defense of mental disease or defect. The court set trial for January 9, 2006 (the first trial setting). At this point (October 27, 2005), Couture's case was **528 days** old.

## VI. Discovery/Suppression Issue, Act II; New Counsel; Further Investigation; and Four New Trial Settings (Oct. 27, 2005, to July 17, 2006; 263 days)

¶24 The same day that the District Court issued its order suppressing "[t]he evidence obtained from the May 17, 2004 search warrant and application," the prosecutor filed a motion for clarification, asserting that the court's order "does not specify what evidence is suppressed and leaves the State unable to evaluate the impact of the suppression order on its case." The prosecutor also raised this issue at the omnibus hearing, stating that "at this point I have no idea what evidence has been suppressed." The court ordered the parties to brief the issue and set a hearing on the matter for November 3. In addition, the court ordered the State to file the return on the missing May 17, 2004 search warrant. *See* § 46-5-301(1), MCA. However, the return had also been lost. So, the prosecutor instead filed an "Evidence Log," which listed various items including those seized in the May 17 search.

¶25 Meanwhile, Dupuis was charged criminally in an unrelated matter and thus could not represent Couture any longer. The District Court apprised Couture of the situation at the November 3 hearing and, with the specific intent of minimizing any further delay, appointed *two* attorneys, Ben Anciaux and John Putikka, to take over Couture's defense.

14

The court continued the "clarification" matter for a week to allow Anciaux and Putikka to get up to speed with the case, and set a status conference for November 10. Three further continuances followed (November 10 to November 17 to December 1 to December 8) due to the fact that Dupuis had not yet turned over to Anciaux and Putikka her complete file on Couture. The court issued an order directing her to deliver the file.

¶26 On December 8, Anciaux reported that he now had the complete file but that the January 9 trial date was unfeasible. He stated that Couture had agreed to file a speedy trial waiver "for the purpose of Mr. Putikka and myself getting up to speed and replying to" the prosecutor's motion for clarification, and he noted that this suppression-related issue needed to be resolved before the case could go to trial. The court agreed to a continuance and set a scheduling conference for December 15. Furthermore, despite Anciaux's apparent readiness to waive his client's right to a speedy trial, the court stated that it would not require a waiver in this instance because the delay at issue had not been created by Couture, but rather by actions of Dupuis over which Couture had no control.

¶27 Pursuant to discussions at the December 15 scheduling conference, the District Court set January 19, 2006, as the deadline for the defense's response to the prosecutor's motion for clarification. The court also set an omnibus hearing for January 19 so that Anciaux and Putikka could review the original Omnibus Order (adopted during Dupuis' representation) and make amendments to it if necessary. Finally, the court set a motions hearing for January 31 and trial for February 27 (the second trial setting).

¶28 On January 19, however, Anciaux advised the court that he, Putikka, and Couture had "come to the conclusion that there's a number of things that we need to investigate

15

before we will be adequately prepared to negotiate pleas, go through and decide whether an omnibus is complete in the file, what additional motions are necessary, and basically just be prepared to move forward in this case." To that end, Anciaux requested a private investigator at State expense, and he asked the court to bump all scheduled hearings back one month and to vacate the February 27 trial date. He acknowledged that Couture was "reluctant" to agree to a continuance, but he explained that he and Putikka "don't believe that we can be adequately prepared to represent him on that date." Anciaux noted that Couture would provide a speedy trial waiver, but the court stated that it would not require a waiver on this occasion "because it was his previous counsel the Court had appointed that created some of the delay in this matter." The court observed that it wanted to get the case to trial "as rapidly as possible" but also wanted to make sure that "the parties have sufficient time to come up to speed and to evaluate where we are in this case given the background of this matter." Thus, the court continued the matter for four weeks (to February 16) and set February 21 as the deadline for filing motions, March 20 as the motions hearing, and April 24 as the next trial date (the third trial setting).

¶29     But at the February 16 status conference, Anciaux and Putikka advised the court that it was doubtful they could be ready for trial by April 24. For one thing, Putikka had a murder trial scheduled from March 7 through March 17 and thus would be unable to do any work on Couture's case during that period. The court, however, pointed out that it had appointed *two* attorneys to take over Couture's defense for this very reason and that it expected there to be "some division of labor" between them. Putikka also stated, though, that the defense investigator needed more time to review the discovery materials and that

16

he (Putikka) could not be prepared to file motions by the February 21 deadline because he had just received the transcripts of the prior proceedings on the suppression issue. He did not explain, however, when he had provided the discovery materials to the investigator, why the investigator needed more time, or why he had not obtained the transcripts sooner. In any event, Putikka asked the court to extend the deadline for filing motions "at least another two to three weeks." The court agreed to move the deadline to March 20 but refused to vacate the trial date, stating that it intended to keep the case "on track" for an April 24 trial. The court noted that it was concerned about the length of time which Couture had been incarcerated and that, although Anciaux and Putikka had been brought in at a late date, it did not want the case to get further behind.

¶30 On March 20, Anciaux filed a motion to suppress "any and all evidence seized pursuant to [the] search warrants issued in this matter and any and all statements made by the Defendant."[1] At a status conference on March 23, the court indicated that it intended to stick to the April 24 trial date; however, Anciaux again suggested that this date would not be feasible because "[w]e've just recently had the private investigator come on board

---

[1] Besides the May 17, 2004 search warrant, detectives obtained three additional search warrants on May 18, 2004. As explained in the District Court's findings of fact, the detectives suspected that McLeod's death had occurred in Couture's house, and in order to gain access to the house without alerting Couture that he was a suspect in the homicide, they obtained the May 17 warrant to search the house for evidence of drug sales. This would enable them "to watch for any evidence of the homicide which might be found during the service of the drug warrant." (The propriety of this tactic is not at issue here.) Couture was then taken into custody on drug charges, and he subsequently made admissions concerning the homicide after the interviewers told him about evidence that had been observed during the search of his house. The next day, based in part on information gained from the May 17 search, the detectives obtained the three May 18 warrants for Couture's house and two vehicles.

full time. He has reviewed the file. It's my understanding that he is prepared to go do interviews and collect[ ] some other evidence." Anciaux thus advised the court that he might be filing a motion to continue, and he in fact did so on April 10 "on the grounds that additional investigation is required in this matter." The prosecution did not object, and the court granted the motion. It set the motions hearing for April 28 and trial for June 12 (the fourth trial setting).

¶31 On April 14, the prosecutor filed his response to Couture's motion to suppress. Among other things, he raised the doctrine of inevitable discovery, i.e., that the evidence in question would inevitably have been discovered through lawful means. *See generally State v. Ellis*, 2009 MT 192, ¶¶ 48-59, 351 Mont. 95, 210 P.3d 144.

¶32 On April 27, Anciaux filed a motion to continue the April 28 motions hearing to May 25 "on the grounds that additional investigation is required in this matter," though he did not provide an explanation for why additional investigation was required. The prosecution did not object, and the court reset the hearing for May 26. But on May 25, Anciaux and Putikka requested another continuance of the hearing and also advised the court that the June 12 trial date was almost certainly unworkable. For one thing, Putikka stated that he was going to be out of town training for a new job, which he had recently taken with the Office of the State Public Defender. Moreover, Anciaux explained that "because I don't know the facts well enough" to respond to the prosecutor's inevitable discovery argument, he had made arrangements to interview various persons including "all of the officers, the girlfriend, [and] the person that Mr. Couture is supposed to have given the gun to." The court agreed to continue the hearing for one week but directed

18

counsel to notify the court within 24 hours whether they were going to utilize the June 12 trial date. The court noted that it was concerned about Couture's right to a speedy trial; and while it had not been requiring speedy trial waivers for the last several continuances, the court observed that it "would have more of a reason to impose some of the delay more recently on the defendant because we're getting further and further away from the reasons that you gentlemen were appointed originally." Later that same day (May 25), Anciaux filed a motion to continue the trial "on the grounds that additional investigation is required in this matter." The State did not object, and the court reset it for August 7 (the fifth trial setting). The court also reset the motions hearing for June 30.

¶33 The hearing on the prosecutor's October 26, 2005 motion for clarification and on Couture's March 20, 2006 motion to suppress finally occurred on June 30. The State called three witnesses. At the conclusion of the hearing, Anciaux requested that he be given time to brief some issues that had arisen during the hearing. The court granted this request and set a deadline of July 7 (four working days after the hearing). The judge acknowledged that this would put the parties "under some pressure," but she explained that her intention was to maintain the August 7 trial date, noting that "we have certainly delayed [the trial] long enough that that causes me significant concerns." On July 17, the court entered its Facts, Conclusions of Law, and Order. In short, the court ruled that all of the evidence obtained from the May 17, 2004 search plus, as fruit of the poisonous tree, all of the ensuing evidence (including Couture's statements to detectives and the evidence obtained from the May 18, 2004 search warrants) had to be suppressed, except for the evidence that was discovered from an independent source, and except for the

19

evidence that would have been inevitably discovered. The court specified the items of evidence that fell into these two categories. The case, now in its **791st day**, was on course for trial on August 7.

**VII. Discovery/Suppression Issue, Act III; Notice of Additional Witnesses; Motion to Withdraw; and Three New Trial Settings (July 17 to Nov. 27, 2006; 133 days)**

¶34 At a July 21 status conference, however, Anciaux asked the court to vacate the August 7 trial date. He noted that Couture "is having a hard time in jail," but that "in the interest of his defense he agrees with counsel that a little more time is necessary." Anciaux explained that the court's ruling on the suppression issue had "changed the focus of the defense" and had "raised some other issues." He indicated that it would take him until mid-September to explore and investigate fully the "evidentiary situation" created by the court's ruling and "to prepare for what we believe the true defense in this is now." He noted that the prosecutor likewise wanted more time to evaluate the court's decision.

¶35 The court advised the parties that it had a trial date available on August 28 and that the next available date after that would probably be in November. The court added that it was reluctant to grant a continuance, given that they were well over two years into the case and already on the fifth trial setting. Furthermore, the court stated that it did not want to reset the trial for a new date "if we're just going to get to that trial date and do the same thing again, which is what's been happening." Addressing Couture directly, the court said that it was "more than happy to make everybody go to trial on August 7th," to which Couture replied: "Yes; I know. But the way it sound[s] to me, I need more time." He indicated that he was "pretty sure" going to trial on August 7 would not be in his best

20

interests. The court therefore agreed to continue the trial and subsequently issued an order resetting it for October 30 (the sixth trial setting).

¶36 Later that same day (July 21), the prosecutor filed a motion for clarification of the court's July 17 order on the suppression issue. The court set a hearing for August 31, but left the trial set for October 30. At the hearing, the State called one witness. The parties were then given time to submit proposed findings of fact and conclusions of law and any objections to the other party's proposals. On October 16, the court issued an order holding that there was sufficient probable cause for the May 18, 2004 search warrants independent of the information gained under the May 17 search warrant and, therefore, that the evidence seized under the May 18 search warrants would not be suppressed.

¶37 Sometime in October, the parties discussed a possible plea agreement. Anciaux and Putikka proposed that Couture plead guilty to negligent homicide, but the prosecutor countered with a proposal that he plead to mitigated deliberate homicide. Ultimately, an agreement was not reached.

¶38 Meanwhile, on October 11, the prosecution filed a Notice of Additional Witnesses. One of the 10 witnesses listed in the notice was Emmanual Little Wolf, who had been incarcerated with Couture at the Lake County Jail. According to the prosecutor, Little Wolf gave a statement to detectives in March 2006 concerning admissions Couture had made about McLeod's murder. Initially, the prosecutor decided not to use Little Wolf as a witness because he already had Couture's recorded admissions about the murder. But when the court suppressed Couture's statements in its July 17, 2006 order, the prosecutor decided that he might call Little Wolf after all.

21

¶39     As a result, Anciaux filed a motion to withdraw as counsel due to a conflict of interest arising out of his simultaneous representation of Little Wolf when Little Wolf gave his statement to detectives against Couture.  At a hearing on October 26, the court indicated that it would allow Anciaux to withdraw.  This, in turn, led to a discussion of whether Putikka would be prepared to try the case without Anciaux the following Monday (October 30).  In this regard, Anciaux and Putikka explained that because they had divided the work between them, there were things Anciaux had handled with which Putikka was not intimately familiar, and as a result Putikka would need time to get up to speed on those facets of the defense.  The court raised the issue of Couture's right to a speedy trial, but Putikka responded that Couture also had the right to a fair trial, and he stated that there was "no possible way" he could be prepared for trial by October 30.  He inquired whether the court had time available in December,  but  the court—clearly exasperated with the  repeated delays—balked  at  this  suggestion.    Likewise,  the prosecutor indicated that he would object to a continuance of more than two or three weeks.  Thus, the court instead set trial for November 13 (the seventh setting), noting that this would give Putikka three weeks to prepare.  The court rejected his contention that this would not be enough time because he had other cases and could not "just drop everything else and [work on Couture's case] for the next three weeks."  The court noted that he had resources available to him for handling his various cases.  Also, when Putikka later expressed his appreciation that the prosecutor had quickly filed a response to the defense's motions in limine, the court aptly observed:  "It's amazing when I back you guys up against the wall you get things accomplished."

22

¶40    Two other issues were addressed at the October 26 hearing. The first concerned a letter from Couture in which he stated that he did not want any contact with his attorneys. Following some discussion, he advised the court that he would allow counsel to continue on his behalf and would communicate with them. The second issue concerned Couture's fitness to proceed. Putikka explained that during the preceding four or five months, he personally had seen Couture's mental state "deteriorating somewhat." And now, in light of Couture's letter, Putikka questioned whether Couture was making rational decisions about assisting his attorneys in preparing a defense. Noting that it had been 18 months since Couture's previous evaluation, Putikka suggested that a psychologist or psychiatrist should visit Couture in jail and make sure that he is fit to proceed to trial. In response, Couture stated that "I don't have any mental issues at all. You know, I'm just a little stressed out because this has gone on for two and a half years." The judge acknowledged his concern and noted that she shared it. Nevertheless, the court authorized Putikka to retain Dr. Stratford "to provide any further support that you believe is necessary."

¶41    On November 2, the prosecutor and Putikka jointly moved to continue the trial. For one thing, two prosecution witnesses were going to be out of state during the week of November 13. Also, Putikka explained that he had assigned another attorney to the case and she was presently getting up to speed. The court reset trial for November 27 (the eighth and final trial setting) and told counsel "it's highly unlikely that there is anything . . . that's not going to allow this case to go forward on the 27th."

¶42    On November 16, Couture sent an Inmate's Request Grievance to the court, stating that if Putikka was not ready for trial on November 27, he wanted new counsel.

23

On November 17, Putikka and his co-counsel filed a motion to dismiss on the ground that Couture's right to a speedy trial had been violated. Applying the speedy trial test set forth in *City of Billings v. Bruce*, 1998 MT 186, 290 Mont. 148, 965 P.2d 866, the District Court denied the motion.

¶43 The case proceeded to trial on November 27—**924 days (nearly 31 months) and 35 continuances after Couture's arrest**. Not all of these continuances resulted in a corresponding postponement of the trial date. Some were continuances of deadlines and hearings which did not require that the trial be reset. Nevertheless, the sheer quantity of them evidences a repeated failure on the part of defense counsel, the prosecutor, and the court to stick to deadlines, and also reflects the intolerably protracted manner in which trial preparations were conducted.

¶44 After a four-day trial, the jury found Couture guilty of deliberate homicide and both counts of tampering with or fabricating physical evidence. The District Court sentenced him to life imprisonment on the homicide charge, with no eligibility for parole, and to two 10-year terms of imprisonment on the tampering charges, again with no eligibility for parole, all sentences to be served consecutively.

### VIII. Appeal

¶45 Couture appealed to this Court (*State v. Couture*, No. DA 07-0189), arguing that he had received ineffective assistance of counsel resulting in a deprivation of his right to a speedy trial under *Bruce*. While the parties were briefing the appeal, this Court issued its decision in *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815, where we adopted a revised speedy trial test. We therefore dismissed Couture's appeal without

24

prejudice and remanded the case to the District Court for consideration of his speedy trial claim in light of *Ariegwe*. On remand, the parties briefed the speedy trial issue under *Ariegwe*, and the District Court held an evidentiary hearing at which Nistler, Anciaux, Putikka, Couture, the judge's judicial assistant, and a lieutenant from the Lake County Sheriff's Office testified. Applying *Ariegwe*, the court again denied Couture's motion to dismiss. The court's reasoning is discussed below where applicable. Couture again appeals.

## ANALYTICAL FRAMEWORK AND STANDARD OF REVIEW

¶46 We analyze a speedy trial claim under a four-factor balancing test. We examine (1) the length of the delay, (2) the reasons for the delay, (3) the accused's responses to the delay, and (4) prejudice to the accused as a result of the delay. We then balance these factors with any other relevant circumstances to determine whether the right to a speedy trial has been violated. *Ariegwe*, ¶¶ 106-112; *State v. Billman*, 2008 MT 326, ¶ 11, 346 Mont. 118, 194 P.3d 58.

¶47 We apply two standards when reviewing a district court's ruling on a speedy trial motion. First, we review the factual findings underlying the court's ruling to determine whether those findings are clearly erroneous. *Ariegwe*, ¶ 119. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *Ariegwe*, ¶ 119. Second, whether the defendant has been denied the right to a speedy trial presents a question of constitutional

25

law, which we review de novo to determine whether the district court correctly interpreted and applied the law.[2]  *Ariegwe*, ¶ 119; *Billman*, ¶ 8.

## DISCUSSION

¶48    None of the four speedy trial factors "is either a necessary or a sufficient condition to the legal conclusion that the accused has been deprived of the right to a speedy trial. Rather, the factors must be considered together with such other circumstances as may be relevant." *Ariegwe*, ¶ 102.  In the present case, however, we note that Factor Two (the reasons for the delay) entails a more lengthy and involved analysis, given the number of continuances and delays.  Indeed, the parties have dedicated more of their briefing to this factor than the other three, and there correspondingly are more issues requiring resolution under this factor.  For these reasons, after addressing Factor One, we will address Factors Three and Four and then return to Factor Two.

### I.  Factor One:  The Length of the Delay

¶49    The period between accusation and trial in this case was 924 days.  Given that this is 724 days beyond the 200-day trigger date for speedy trial analysis, the District Court

---

[2]  The State acknowledges these two standards but contends that this Court "accords trial courts deference when reviewing the speedy trial factors."  This is incorrect.  It is true that we will not disturb a factual finding unless it is clearly erroneous. *Billman*, ¶ 8.  However, "whether the factual circumstances, when evaluated pursuant to the four-factor balancing test, amount to a speedy trial violation" is a question of law, *Ariegwe*, ¶ 119, and "[o]n questions of law, the parties are entitled to full review by the appellate court without special deference to the views of the trial court," *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 18, 336 Mont. 105, 152 P.3d 727.  Our observations in ¶¶ 17 and 23 of *State v. Hardaway*, 2009 MT 249, 351 Mont. 488, 213 P.3d 776, cited by the State here, do not support a third "deference" standard in speedy trial analysis. Rather, they reflect our conclusion that the district court in that case reached the correct result, although there were errors in the court's approach that did not ultimately affect the outcome of the case.

correctly concluded that the State carries "a heavy burden" to justify the delay (Factor Two). *See Ariegwe*, ¶¶ 62, 123. Moreover, the presumption of prejudice is substantially increased; and the court correctly concluded that the State, therefore, must make "a very persuasive showing" that Couture was not prejudiced (Factor Four). *See Ariegwe*, ¶¶ 56-58, 123; *Billman*, ¶ 18; *State v. Morrisey*, 2009 MT 201, ¶ 53, 351 Mont. 144, 214 P.3d 708; *State v. Hendershot*, 2009 MT 292, ¶ 10, 352 Mont. 271, 216 P.3d 754.

## II. Factor Three: The Accused's Responses to the Delay

¶50 Under the third speedy trial factor, we evaluate the accused's responses to the delay, i.e., his or her acquiescence in and objections to pretrial delays. *Ariegwe*, ¶ 110. The issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. *See Ariegwe*, ¶¶ 76-77, 80-82, 110. The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial. *Billman*, ¶ 31; *Ariegwe*, ¶ 79. In addition, the accused's responses provide guidance for balancing the other factors. *See Ariegwe*, ¶¶ 78, 110.

¶51 Analyzing Couture's responses to the delays, the District Court observed that, on one hand, he "occasionally expressed reluctance to acquiesce in delay despite the advice of counsel." For example, he resisted Nistler's request for a second mental health evaluation, he turned down a plea offer and asked to go to trial, he was reluctant to agree to Anciaux's request for a continuance of the February 2006 trial date, he stated at the

October 26, 2006 hearing that he was "stressed out because this has gone on for two and a half years," and he sent a grievance to the court on November 16, 2006, stating that if Putikka was not ready for trial on November 27, he wanted new counsel. On the other hand, however, the court observed that Couture had signed three speedy trial waivers (on January 3, June 14, and September 8, 2005). In addition, the court noted that when it raised the issue of speedy trial with Couture at the July 21, 2006 status conference, he affirmed that he wished to continue the August 7 trial date. Furthermore, Couture sent the court a letter in October 2006 seeking to sever all contact with defense counsel, even though the court advised him that this would delay his trial. Thus, taking these circumstances together, the District Court concluded that Couture's responses to the pretrial delays were "inconsistent."

¶52 In *Ariegwe*, we accorded little weight to Factor Three in the overall balancing because the defendant there had been operating under the mandates of our old speedy trial test. *See Ariegwe*, ¶ 138. Under the old test, a defendant satisfied this factor simply by invoking his right to a speedy trial at any time prior to the commencement of trial. *See Ariegwe*, ¶ 137; *City of Billings v. Bruce*, 1998 MT 186, ¶ 57, 290 Mont. 148, 965 P.2d 866. Here, because Couture was likewise operating under *Bruce*, the District Court accorded little weight to Factor Three, stating that it weighed only "lightly" in his favor.

¶53 On appeal, Couture argues that he in fact "[c]learly" wanted to go to trial. He points out that on multiple occasions he refused to consider a plea and instead insisted on going to trial. He also contends that the waivers he filed were actually consistent with his desire to stand trial. He explains that he only agreed to waivers so that Nistler could

28

complete his investigation (January 3 waiver), so that Dupuis could get up to speed after replacing Nistler (June 14 waiver), and so that Dupuis could litigate the suppression issue (September 8 waiver). Couture observes that, in contrast, when it appeared to him that Putikka was taking too much time to get the case to trial, he objected to the delay.

¶54 None of these facts, however, undermine the District Court's assessment that Couture's responses to the delays were "inconsistent," and the record supports this characterization given Couture's expressed desire, at times, to go to trial, coupled with his willingness, at other times, to delay the trial. Ultimately, though, even if Couture harbored a strong desire throughout the pretrial period to be brought to trial as promptly as possible, the evidentiary support for this in the record is simply not compelling enough to tip the balancing heavily in his favor. Rather, we agree with the District Court that Factor Three weighs "lightly" in his favor.

### III. Factor Four: Prejudice to the Accused

¶55 Under Factor Four, we consider whether the pretrial delay prejudiced the accused in light of the interests that the speedy trial right protects: (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by the presence of unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired. *Ariegwe*, ¶ 111. As noted, the State bears a heavy burden to show that Couture was not prejudiced. *See* ¶ 49, *supra*.

### i. Prevent Oppressive Pretrial Incarceration

¶56 Whether an accused's pretrial incarceration was "oppressive" depends on the particular circumstances of that incarceration. *Ariegwe*, ¶ 90. We consider the duration

of the incarceration, the complexity of the charged offense, any misconduct by the accused directly related to his incarceration, and the conditions of the incarceration, such as overcrowding, recreational opportunities, adequate food, climate control, proper medical care, cleanliness, and legal research capabilities. *See Ariegwe*, ¶¶ 90-93.

¶57 Couture was incarcerated for the entire 924-day period between arrest and trial, which the District Court stated would normally support a finding of prejudice but for three considerations: Couture never asked the court to set bond or otherwise consider releasing him before trial; Couture was responsible for the vast majority of the delay; and the conditions of his incarceration were not oppressive. While Couture challenges this analysis on several grounds, we conclude that the court's ultimate determination is supported by the record.

¶58 First, regarding the duration of the incarceration, 924 days (roughly two and a half years) is an extremely long time to be incarcerated on unproven charges. Indeed, the District Court repeatedly expressed concern during the pretrial period about the fact that Couture was incarcerated. The duration of Couture's incarceration, therefore, supports a finding of oppressiveness.

¶59 On the other hand, however, we have said that the length of pretrial incarceration that is "oppressive" is less for a relatively simple offense than it is for a complex charge. *Ariegwe*, ¶ 91. Thus, in *Billman*, we held that the "lengthy" incarceration of 278 days, coupled with the relatively simple charges (felony DUI and two misdemeanor driving offenses), established that the pretrial delay had prejudiced the defendant. *Billman*, ¶ 41. But here, as the State points out, the charges of deliberate homicide and tampering with

evidence were more complex, as evidenced by the extensive defense investigations. Couture also obtained multiple mental health evaluations; and at the January 27, 2005 hearing, he agreed with Nistler, on the record, that obtaining a private psychiatrist to assist in his defense was "in [his] best interest," even though he would remain in custody for a longer period of time. The complexity of the charged offenses and the need to explore plausible defenses to those charges justified a longer period in which to prepare for trial, a correspondingly longer period of pretrial delay, and therefore a longer period of pretrial incarceration, given that Couture was not out on bail.

¶60 In this connection, we agree with Couture that his failure to seek bail is not particularly significant. The reason he did not do so was because he did not have sufficient resources to meet any bail obligation imposed on a deliberate homicide charge. Nevertheless, we have previously indicated that bail and the defendant's inability to post it may be a relevant circumstance to consider under this prong of the analysis—though it is by no means a tipping point. There are various factors which go into the determination of bail. Among other things, the bail amount must be "commensurate with the nature of the offense charged" and "sufficient to ensure the presence of the defendant in a pending criminal proceeding." Section 46-9-301(1), (5), MCA. Thus, in *State v. Keyes*, 2000 MT 337, ¶ 18, 303 Mont. 147, 15 P.3d 443, we held that "[a]s to any prejudicial effects of Keyes' lengthy pretrial incarceration, there can be no doubt in this case that a high bail and resulting incarceration were necessary in light of the very serious offenses with which Keyes was charged and his demonstrated ability and willingness to abscond from justice." In other words, the fact that the accused remained incarcerated due to a high

bail is less likely to be deemed "oppressive" when the record establishes that the high bail was necessitated by the nature of the offense charged or the accused's status as a high flight risk. In the present case, had Couture requested bail, he concedes that it would have been quite high, given the charge of deliberate homicide. Hence, his resulting incarceration, due to the serious nature of the offense with which he had been charged, weighs against a finding of oppressiveness.

¶61    Lastly, if the duration of a defendant's incarceration pending trial was due in part to a deliberate attempt by the prosecution to delay the trial, this fact would weigh in favor of the conclusion that the incarceration was unduly prolonged and, thus, was oppressive. Couture in fact makes this point on appeal, contending that his stay of roughly nine months in solitary confinement was oppressively lengthy due to the delays in getting his case to trial, which he contends were attributable to the State. We conclude below under Factor Two, however, that the majority of the pretrial delay—and, correspondingly, the majority of Couture's pretrial incarceration—is attributable to the defense, not the State. This fact weighs against a finding of oppressiveness.

¶62    Aside from the duration of and the reasons for the incarceration, the other primary consideration here is the conditions of the incarceration. "When analyzing the conditions of the incarceration to assess oppressiveness, we focus on the condition of the facilities and how they impact the accused, rather than solely on the condition of the accused." *Billman*, ¶ 41. As noted, Couture complains of his stay in solitary confinement. Yet, his placement in solitary was at his own request because he "couldn't handle" being around the other inmates in the general population. Moreover, he conceded at the speedy trial

hearing that he had access to a recreation room, received three meals a day, and was provided hot water, showers, light, and other necessities, including medical treatment. Likewise, Michael Sargeant (Lake County Undersheriff during Couture's incarceration) testified at the hearing that the jail adhered to special dietary guidelines and provided bathing, laundry, television, board games, and recreational opportunities—all of which weighs against a finding of oppressiveness.

¶63 For the foregoing reasons, we conclude that while Couture's incarceration was quite lengthy, the circumstances of the incarceration were not oppressive. Therefore, this factor provides little support for a finding of prejudice resulting from the pretrial delay.

### ii. Minimize the Accused's Anxiety and Concern

¶64 In evaluating anxiety and concern, the focus is on the ways in which the presence of unresolved criminal charges disrupted the accused's life. A certain amount of anxiety and concern is inherent in being accused of a crime. Also, the speedy trial guarantee is designed to *shorten* the disruption of the accused's life, not to eliminate it altogether. Thus, the critical question is whether the delay in bringing the accused to trial "unduly prolonged" the disruption of his or her life or "aggravated" the anxiety and concern that are inherent in being accused of a crime. *Ariegwe*, ¶ 97.

¶65 Here, the District Court found that Couture's anxiety and stress appeared to rise beyond the level one would expect from anyone facing such serious charges. Although he suffered from anxiety and depression prior to incarceration, the court observed that his feelings of anxiety, stress, and depression worsened as his case was delayed. The court noted that on one occasion, Couture suffered a panic attack and believed he was going to

33

die. He required medication and was twice hospitalized. In addition, he spent more than 275 days of his pretrial incarceration in solitary confinement. For these reasons, the court weighed this factor in Couture's favor, but only "lightly" in his favor. The court reasoned that the intensity of Couture's anxiety and concern "was largely of his own making" because he had asked to be placed in solitary confinement and because most of the pretrial delay was attributable to him.

¶66 On appeal, Couture argues that this factor should have weighed "much more strongly" in his favor, while the State argues that, "[i]f anything, this factor should have weighed in favor of the State." Neither party, however, has demonstrated that the District Court's findings are clearly erroneous. And on the record before us, we agree with the court that this factor weighs lightly in Couture's favor on the question of prejudice.

### iii. Limit the Possibility that the Defense Will Be Impaired

¶67 Under the third interest, we consider issues of evidence, witness reliability, and the accused's ability to present an effective defense. *Ariegwe*, ¶ 98. This is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. *Ariegwe*, ¶ 99. Thus, the accused's failure to submit affirmative proof of prejudice is not fatal to a speedy trial claim; and, in the absence of affirmative proof of impairment, we focus on the other speedy trial factors to assess whether the pretrial delay has prejudiced the accused's defense. *Billman*, ¶ 47.

¶68 The District Court reasoned that the pretrial delay in this case did not prejudice Couture's defense, but rather benefitted it. The basis for this determination was that the loss of the May 17, 2004 search warrant and application resulted in the suppression of

incriminating statements and other evidence. Thus, the court weighed this factor heavily in favor of the State. We agree with Couture, however, that the court ascribed too much weight to the suppression issue. For one thing, the reason the evidence was suppressed was not because of the lengthy pretrial delay. Rather, it was because the State failed to produce the documents when discovery was first requested in May 2004 and then lost the search warrant and application in February 2005. Moreover, while the District Court initially suppressed all the evidence obtained as a result of the May 17 search warrant, including Couture's statements and the evidence obtained from the May 18 search warrants, it later ruled that all of the evidence obtained from the May 18 search warrants was admissible. Finally, while it is true that Couture fortuitously benefitted from the fact that defense counsel did not press for the May 17 search warrant and application until five months after these documents had been lost, this benefit simply cannot be attributed to the entire 924-day delay as the court did here.

¶69 On the other hand, the State directs our attention to *State v. Morrisey*, 2009 MT 201, ¶ 71, 351 Mont. 144, 214 P.3d 708, where we reasoned that

> a substantial portion of the delay was requested by Morrisey for the express purpose of conducting investigations, having evidence tested, locating and interviewing potential witnesses, and preparing his defense to the charges. If anything, therefore, the record suggests that Morrisey's ability to prepare his defense was benefited, not prejudiced, by the continuances in his trial.

The State argues, and we agree, that the same reasoning applies here. Couture requested multiple continuances for the express purpose of conducting investigations, interviewing witnesses, obtaining mental health evaluations, and otherwise preparing his defense. His defense presumably benefited from having the time to accomplish these objectives. The

State also points out that one of its witnesses (the lead detective) died during the pretrial period. *Cf. Barker v. Wingo*, 407 U.S. 514, 521, 92 S. Ct. 2182, 2187 (1972) ("As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so."). For these reasons, we are not persuaded that Couture's ability to mount a defense was impaired significantly (if at all) by the delay in bringing him to trial.

### iv. Summary

¶70    We conclude that the State has overcome the presumption of prejudice in this case. Couture's pretrial incarceration was unquestionably lengthy, and his anxiety and concern were aggravated by the delay. But the incarceration was not oppressive, and he has not demonstrated an impaired ability to present an effective defense as a consequence of the delay. In fact, many of the continuances were sought, and granted, for purposes of defense preparations. Accordingly, Factor Four weighs in favor of the State.

### IV. Factor Two: The Reasons for the Delay

¶71    We now consider the reasons for the delay in this case. To do so, we must identify each period of delay, attribute the delay to the responsible party, and then assign weight to each period based on the specific cause and motive for the delay. *Ariegwe*, ¶¶ 63-67; *Billman*, ¶ 20. Because the question is one of "delay," we are not concerned with actions or events that did not result in a delay of the trial. *See Ariegwe*, ¶ 63. Thus, for example, a request for additional time to file a brief is not counted against the party unless it results in a postponement of the trial.

36

¶72   With respect to delays that are attributed to the prosecution, any that were caused in bad faith—such as a deliberate attempt to hamper the defense—weigh heavily against the State. *Ariegwe*, ¶ 67. Delay caused by negligence or lack of diligence occupies a middle ground, but still " 'falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.' " *Ariegwe*, ¶ 69 (quoting *Doggett v. United States*, 505 U.S. 647, 657, 112 S. Ct. 2686, 2693 (1992)); *see also e.g. State v. Lacey*, 2010 MT 6, ¶¶ 16-19, 355 Mont. 31, 224 P.3d 1247. Institutional delay—i.e., delay inherent in the criminal justice system and caused by circumstances largely beyond the control of the prosecutor and the accused, such as overcrowded court dockets—is attributable to the State, but weighs less heavily against it than delay caused by bad faith, negligence, or lack of diligence. *Ariegwe*, ¶ 68; *Billman*, ¶ 20. Finally, "valid reasons" for delay, such as a missing witness, are weighed least heavily against the State. *Ariegwe*, ¶ 70; *but see Billman*, ¶¶ 24-27. Delays attributed to the defense are classified under a similar approach. Thus, delay caused by the accused to avoid being brought to trial or for tactical reasons weighs more heavily against him than does delay caused by a missing witness. *Ariegwe*, ¶ 71.

¶73   At the outset, we observe that our task in conducting this analysis in the present case is substantially more difficult due to the fact that no trial date was set for the first 528 days of the 924-day pretrial period. There were numerous continuances during those 528 days, yet it is virtually impossible to determine whether a given continuance granted for purposes of filing a brief or conducting further investigations actually caused a delay in the trial, since no trial date existed. Likewise, in a case such as this, where there were

37

multiple delaying forces at work—such as the court's plea agreement policy, defense investigations, the State's loss of the May 17, 2004 search warrant and application, and multiple replacements of defense counsel—it is difficult to evaluate a particular delaying force's precise impact on the case when, again, no trial date had been set.

¶74 For these reasons, it is essential that a firm trial date be set at the defendant's arraignment and that a firm trial date be maintained all the way to trial. Doing so serves several critical purposes. For one thing, as just noted, it facilitates an analysis of which actions and events in the course of trial preparations actually resulted in delays of the trial and who was responsible for them. It also gives the parties a firm goal they must work toward—a deadline by which preparations are to be completed. In this regard, a firm trial date enables testing facilities, such as the State Crime Lab, to prioritize which items of evidence need to be tested first. Likewise, it gives retained experts notice of when their reports need to be completed. In short, a firm trial date provides the impetus for the parties to prepare their cases diligently for trial and enables the trial court and this Court to gauge whether the parties are holding to their obligations. In addition, given the reality of crowded court dockets, trials often must be scheduled for a date weeks or months in the future. Here, for example, the District Court observed at the July 21, 2006 status conference that it had a trial date available on August 28 and that the next available date after that would probably be in November. Maintaining a trial date at all times allows this "docket delay" of a few weeks or several months to pass *simultaneously* with the time the parties spend conducting investigations and research, filing briefs, obtaining evaluations, waiting on test results, and otherwise preparing their cases. Indeed, the

38

notion that a trial date should not be set until certain pretrial events have occurred (such as the omnibus hearing) or until all test results have been received[3] is a fallacy not only because, in the absence of a firm deadline, the parties are left to complete their preparations at an arbitrary—and often protracted—pace, but also because, ultimately, not everything gets done and more time is always needed. Thus, as stated, it is essential that a firm trial date be maintained from arraignment to trial.

¶75 Also hindering our analysis under Factor Two is the lack of proper support for many of the requested continuances in this case. A motion for a postponement must disclose the basis therefor, or it is presumed to be unjustified and is weighed heavily against the proponent (unless evidence elsewhere in the record establishes otherwise). *Ariegwe*, ¶ 129. Moreover, there must be a proper showing that the postponement is, in fact, justified. Simply stating in a motion or at a status conference (as occurred here on multiple occasions) that "additional time is needed" for something, such as interviewing witnesses, conducting investigations, filing a brief, or reviewing the evidence, is utterly insufficient. If time has already been given for these purposes, it is necessary that a justification be provided for why "additional" time is needed. Again, we are concerned here with the fundamental right to a speedy trial, and trial courts should deny any request for a continuance that is not supported by a concrete showing of good cause for the delay. Unfortunately, that was not done in this case, and thus the record does not establish whether the defense's various requests for "additional time" were justified because, for

---

[3] This approach is not exclusive to the Twentieth Judicial District. *See e.g. State v. Rose*, 2009 MT 4, 348 Mont. 291, 202 P.3d 749.

example, a witness needing to be interviewed was out of state, or were not justified because, for example, defense counsel had not been diligent in his or her duties.

¶76 In this regard, three of Couture's attorneys requested continuances or extensions based specifically on the fact that they were busy with other cases. And on appeal, Couture makes a point of noting that Nistler had "between 100 and 120 open files" during the period he represented Couture, Anciaux had "between 80 and 100 felonies in his case load" when he was appointed to represent Couture, and Putikka "had a private practice in Thompson Falls, Montana, some 97 miles from Polson, and had other homicide cases pending." None of these facts, however, constituted "good cause" for delaying Couture's trial. "Defense counsel should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality representation, endangers the client's interest in the speedy disposition of charges, or may lead to the breach of professional obligations." *ABA Standards for Criminal Justice: Prosecution Function and Defense Function*, Standard 4-1.3(e) (3d ed., ABA 1993).[4] "Good cause" is a factual circumstance or event that occurs notwithstanding counsel's diligent efforts to prepare the defense for trial. For example, the fact that a critical witness has been called away on military duty would be good cause for granting a promptly filed motion for a continuance. *Cf. Billman*, ¶ 27. The actual showings of good cause in this case are few.

---

[4] Although we have not adopted the *ABA Standards for Criminal Justice* outright, we do agree with Standard 4-1.3(e), as well as Standard 4-1.3(a) ("Defense counsel should act with reasonable diligence and promptness in representing a client.") and Standard 4-1.3(b) ("Defense counsel should avoid unnecessary delay in the disposition of cases. Defense counsel should be punctual in attendance upon court and in the submission of all motions, briefs, and other papers. . . .").

¶77　As a final preliminary matter, we note that at various points throughout the pretrial period, the court, defense counsel, and the prosecutor all acknowledged that Couture had the right to conduct investigations and otherwise prepare a defense to the charges, which is a corollary to the fundamental right to defend. Mont. Const. art. II, § 24; *see also State v. Knowles*, 2010 MT 186, ¶ 49, ___ Mont. ___, ___ P.3d ___; *State v. Egelhoff*, 272 Mont. 114, 123, 900 P.2d 260, 265 (1995), *rev'd on other grounds*, *Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013 (1996); *Taylor v. Illinois*, 484 U.S. 400, 408-09, 108 S. Ct. 646, 652-53 (1988). In fact, Putikka noted at the October 26, 2006 hearing that Couture had not only the right to a speedy trial, but also the right to a fair trial. This is correct, and the District Court certainly was justified, in light of Anciaux's withdrawal from the case, in granting Putikka time to familiarize himself with those parts of the defense that Anciaux had handled. But, as stated above, defense counsel has a duty to conduct defense preparations diligently and to ensure that the defendant's right to a speedy trial is honored; and neither the defense nor the prosecution can be permitted to hijack the pretrial proceedings to accommodate a lack of sedulity or for other improper purposes.

¶78　Whether that is in fact what occurred in the present case we cannot say on the record before us. What is clear, though, is that the District Court accommodated repeated requests to postpone hearings, extend deadlines, and continue the trial based on vague assertions about more time being needed. The record reflects that the court was concerned about Couture's right to prepare a defense, but also about the ramifications the delays were having on his right to a speedy trial. And we commend the court for trying to make the best of a difficult situation in which it had to replace defense counsel three

41

times and, in so doing, had to give new counsel time and leeway to get up to speed on the case. But it must be remembered that " 'the primary burden' to assure that cases are brought to trial is 'on the courts and the prosecutors.' " *Ariegwe*, ¶ 72 (quoting *Barker v. Wingo*, 407 U.S. 514, 529, 92 S. Ct. 2182, 2191 (1972)). Furthermore, "society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190. Thus, the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner. *Ariegwe*, ¶ 65. And to that end, it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay. *Cf. United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir. 1984) ("Denial [of a motion for a continuance] amounts to a constitutional violation only if there is an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.' " (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 1616 (1983))). The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders.[5]

---

[5] In the present case, the District Court was willing to grant certain continuances on the condition that Couture file a speedy trial waiver. We disagree with this approach for three reasons. First, a defendant cannot be allowed to delay trial through the mere expedient of filing speedy trial waivers. Rather, he must show good cause for a requested continuance. Second, waivers are somewhat inapt in any event given our approach under Factor Two, which is to analyze the specific cause and motive for each period of delay. *Ariegwe*, ¶¶ 63-67, 72. If the defendant caused a particular delay, it will be attributed to him regardless of whether he signed a waiver for that period. Third, if the defendant establishes good cause for a continuance, he cannot be required to waive his right to a speedy trial in order to obtain the continuance any more than he can be required to waive

¶79    With the foregoing points in mind, we now turn to the specific delays in this case.

**1.  Arrest (May 17, 2004) to First Trial Setting (Jan. 9, 2006): 602 Days**

¶80    Due to the unique procedural history of this case—in particular, the lack of a firm trial setting for more than half the pretrial period—it is necessary for purposes of this section to determine what actions and events delayed the setting of the first trial date. Initially, there is no question that the **10 days** between Couture's May 17 arrest and the first scheduled arraignment (May 27) is institutional delay attributable to the State.

¶81    Couture continued his arraignment six times from May 27 to September 9, a total of **105 days**, in order to obtain a mental health evaluation through the State Hospital.  We agree with the District Court that this delay was attributable to Couture.  Couture argues, however, that the 105 days were attributable to the State as "built-in delays inherent in [the] criminal justice system."  He points out that a defendant is entitled to "a reasonable time" to enter his plea (§ 46-12-203, MCA), and he maintains that he required additional time before entering his plea to obtain the mental health evaluation, since a person who is not competent to proceed may not be tried (§ 46-14-103, MCA).  Yet, the fact that the defendant must be competent to proceed does not make the delay for obtaining a mental health evaluation institutional delay.  A defendant must also be given reasonable time to

his right to counsel or his privilege against self-incrimination to obtain the continuance. Of course, the defendant may acknowledge on the record that a specific period of delay will be attributable to him for speedy trial purposes.  But the court cannot force him to waive his right to be brought to trial promptly in order to exercise his right to prepare a defense. *See State v. Bailey*, 201 Mont. 473, 480, 655 P.2d 494, 498 (1982); *Simmons v. United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 976 (1968); *see also Doyle v. O'Fallon*, 2010 U.S. Dist. LEXIS 23897 at *19 (D. Mont. Feb. 5, 2010) ("A defendant cannot be forced to abandon his right to a fair trial to realize his right to a speedy one."), *adopted*, 2010 U.S. Dist. LEXIS 23894 at *2 (D. Mont. Mar. 15, 2010).

prepare a defense to the charges, which could be considered a "built-in delay inherent in the criminal justice system," but this does not mean that delay for defense investigations is institutional delay. Institutional delays are caused by crowded court dockets and other systemic circumstances beyond the control of the prosecutor and the accused, such as a backlog at the State Crime Lab. *See Ariegwe*, ¶¶ 68, 130. Of course, had the State Hospital not been diligent in conducting Couture's evaluation, then such delay would have been attributable to the State. But there is no showing of a lack of diligence here.

¶82 Couture also argues that the postponements of his arraignment should not have been counted against him since they did not cause any corresponding postponements of a trial date. However, setting aside the Twentieth Judicial District Court's particular trial setting procedures, we do not expect district courts in general to set a firm trial date prior to the defendant's entry of a not guilty plea. Thus, it is reasonable to conclude that when a defendant postpones the entry of his plea, as he is statutorily authorized to do, he concomitantly delays the first trial date. We therefore are not persuaded that Couture's continuances of his arraignment did not result in a delay of his trial.[6]

¶83 Next, the District Court correctly attributed the **28 days** from the September 9 arraignment to the first scheduled omnibus hearing (October 7) to the State as institutional delay. Nobody disputes this attribution.

---

[6] Citing *State v. Rose*, 2009 MT 4, ¶ 49, 348 Mont. 291, 202 P.3d 749, the State contends that "this Court allocates delay from continuances even if no trial date has been set." Obviously, this is only true if the continuance somehow results in a "delay" of the trial, such as a continuance of the arraignment, which was the situation addressed in ¶ 49 of *Rose* and is the situation addressed here. But under Factor Two, we do not consider actions or events that did not result in a delay of the trial. *See Ariegwe*, ¶ 63. To the extent *Rose* indicates otherwise, we disagree, and so clarify.

¶84    The next logical period is from October 7, 2004, to January 27, 2005, the date on which Nistler announced that the plea proposal process had been exhausted and the defense embarked on a new defense theory (a mental state or mitigation defense). During this period of **112 days**, Couture repeatedly continued the omnibus hearing in order to conduct investigations and explore the possibility of a plea agreement. The District Court attributed this delay to Couture, but we agree with Couture that the delay is attributable to the court's plea agreement policy. In fact, Nistler specifically cited that policy and the need to exhaust the plea proposal process before proceeding to omnibus as the reason for seeking the continuances. As explained above, the court's plea agreement policy results in seriatim requests for continuances of the omnibus hearing, which the court routinely grants and which, in turn, result in de facto continuances of the trial date. *See ¶¶ 6-8, supra*. In this case, the omnibus hearing was held 413 days after Couture entered his not guilty pleas. This approach conflicts with statutory procedures, which state that the court "shall" hold an omnibus hearing "*[w]ithin a reasonable time* following the entry of a not guilty plea but not less than 30 days before trial." Section 46-13-110(1), MCA (emphasis added). It is also inconsistent with the court's affirmative constitutional obligation to move the case along toward trial in an expeditious manner. The State points out that Couture filed a speedy trial waiver (at the court's insistence) on January 3. But this does not alter the fact that the court's plea agreement policy, together with its policy of not setting a firm trial date until the omnibus hearing, is what caused this built-in, systemic delay in the first place. We therefore attribute the 112 days to the State, though we will weigh that delay the same as we do institutional delay.

45

¶85 The next segment of delay occurred between January 27 and May 19, 2005, a total of **112 days**. During this period, Couture arranged for a second mental health evaluation in order to determine whether a mental state or mitigation defense was plausible, and he acknowledged on the record at the January 27 hearing that this delay could not be held against the State for speedy trial purposes. We agree with the District Court that the delay is attributable to Couture. Couture argues, however, that the court's plea agreement policy "dictated" Nistler's actions in seeking continuances of the omnibus hearing during this period, but the record establishes otherwise. On January 27, Nistler reported that "[w]e have exhausted the plea proposal process at this point." On March 17, Nistler stated that Couture "has rejected any plea proposals, and it appears that the probability is great that it's headed to trial." And on April 14, Nistler noted that Couture "did not wish to accept the plea proposals from the State and wanted this matter to proceed to trial," where "the primary defense would be a mental defense." Hence, there is no merit to the contention that the omnibus hearing needed to be continued in order to exhaust the possibility of a plea agreement. We also are not persuaded by Nistler's insistence at the April 14 hearing that Couture could not go through omnibus until they received Dr. Stratford's report. In fact, the parties could have proceeded with the omnibus hearing on January 27, at which time Couture could have given notice that he was investigating his fitness to proceed and a mental state defense, and that he would file proper notice upon receiving the report from Dr. Stratford. *See* §§ 46-13-110(3)(f), 46-15-323(3), MCA. Simply waiting to receive that report was not good cause for delaying the omnibus

hearing, particularly since delaying the omnibus hearing meant delaying the setting of the first trial date. We therefore weigh the 112 days heavily against Couture.[7]

¶86 The next delay of **84 days** from May 19, 2005, to August 11, 2005, was caused by Couture's request for different counsel and the appointment of Dupuis to replace Nistler. The District Court correctly attributed this delay to Couture.

¶87 Beginning on August 11, 2005, and running through October 16, 2006, there were numerous continuances of the omnibus hearing and, later, the trial date as a result of the discovery/suppression issue. Recall that the State failed to file the return on the May 17, 2004 search warrant (§ 46-5-301(1), MCA), failed to produce the search warrant and application in response to Nistler's May 20, 2004 discovery request (§ 46-15-322, MCA), and thereafter lost both documents. While it appears from the record that these omissions were not due to bad faith, but rather were the inadvertent result of the lead detective's illness, the fault still lies with the State. Act I of the ensuing discovery/suppression saga began August 11 and ended October 26, when the District Court issued its first order suppressing all evidence obtained from the May 17 search warrant. Act II ran from October 26 to July 17, when the court issued its second order clarifying that any evidence which was discovered from an independent source or which would have been inevitably discovered would not be suppressed. Finally, Act III ran from July 17 to October 16, when the court issued its third order clarifying that all evidence seized under the May 18 search warrants would not be suppressed. Having created this situation in the first place,

---

[7] It should be noted here that delay caused by defense counsel is generally charged against the defendant. *See State v. Morrisey*, 2009 MT 201, ¶ 55 n. 10, 351 Mont. 144, 214 P.3d 708 (citing *Vermont v. Brillon*, ___ U.S. ___, 129 S. Ct. 1283, 1290-91 (2009)).

the State bears a measure of responsibility for the resulting delays. However, as detailed below, the defense is also responsible for a substantial portion of them.

¶88    Turning to the **77 days** from August 11, 2005, when the omnibus hearing was first continued because of the discovery/suppression issue, to October 27, 2005, when the omnibus hearing was finally held, the District Court assigned 27 days to the State for lack of diligence and 50 days to Couture based on his September 8 speedy trial waiver. Couture argues, and we agree, that all 77 days are attributable to the State. First, as just noted, the delay associated with the discovery/suppression litigation—especially the initial period leading up to the court's first suppression ruling on October 26—was created by the State's failure to comply promptly and fully with its obligations under the search-and-seizure and discovery statutes. Second, we disagree with the District Court's premise that "we can't get to omnibus until we can get a resolution of the motion to suppress on this matter." Suppression issues do not have to be resolved before omnibus, *see* § 46-13-110(3)(i), MCA, and they certainly do not have to be resolved before a trial date can be set. Thus, there was no basis for requiring a waiver from Couture in this instance. For that matter, Couture could not be required to waive his right to a speedy trial in order to exercise his rights to discovery and against unreasonable searches and seizures. *See State v. Bailey*, 201 Mont. 473, 480, 655 P.2d 494, 498 (1982). Lastly, the continuance of the September 8 hearing to September 22 was sought by Couture *and the prosecution* "to submit briefs and prepare for the hearing." The prosecutor then filed his initial brief on September 21 at 4:07 p.m., which left Couture without adequate time to file his response; and as a result, the hearing had to be continued to October 27. Clearly,

Couture did not intend to waive delay caused by the prosecution. As we have previously held, "delay requested by a particular party may be attributable to the other party." *Ariegwe*, ¶ 66; *see also e.g. State v. Hardaway*, 2009 MT 249, ¶ 20, 351 Mont. 488, 213 P.3d 776 (although Hardaway moved for a continuance, the delay was attributable to the State due to its failure to provide the CI's identity); *State v. Keyes*, 2000 MT 337, ¶¶ 13-14, 303 Mont. 147, 15 P.3d 443 (the time associated with Keyes' application for a writ of supervisory control was attributable to the State, given that the necessity of the application and the resulting delay were due to the confusing nature of the charges under which the State sought to prosecute Keyes). Here, the 77-day delay was directly the result of the State's lack of diligence regarding the May 17, 2004 search warrant.

¶89 Next, the period of **74 days** from the October 27, 2005 omnibus hearing to the first trial setting (January 9, 2006) began with the prosecutor's motion for clarification of the suppression ruling. The District Court assigned the first 7 days of this delay to the State as institutional delay. Then, in early November, the court had to replace Dupuis and give Anciaux and Putikka some time to get up to speed, which was delayed when Dupuis did not promptly turn over her file on Couture. Since Couture neither caused the delay of 67 days nor had control over the situation, the District Court attributed it to the State as institutional delay. We conclude, however, that the particular circumstances surrounding Dupuis' removal as Couture's counsel require a different approach for purposes of this case only. Dupuis was removed after the District Court learned that she had engaged in unlawful conduct in an unrelated matter, which in turn led to the filing of criminal charges against her as well as her suspension and, ultimately, disbarment from the

practice of law in Montana.  The court then promptly took steps to minimize the impact of Dupuis' removal by appointing two attorneys to take over Couture's defense.  Under these unique, fact-specific circumstances, we conclude that the delay of 67 days should not weigh against the State or Couture.

## 2. First Trial Setting (Jan. 9, 2006) to Sixth Trial Setting (Oct. 30, 2006): 294 Days

¶90    On December 8, 2005, Anciaux advised the court that he now had the complete file from Dupuis but that the January 9 trial date was unfeasible because he and Putikka needed time to review the file and prepare for trial, and because the State's motion for clarification of the suppression ruling needed to be resolved before trial.  The court thus reset the trial for February 27, a postponement of **49 days**.  In its speedy trial analysis, the District Court attributed 10 of those days to institutional delay and 39 of the days to Couture.  We agree with Couture, however, that having to continue the trial date from January 9 to February 27 was the direct consequence of having to replace Dupuis and her delay in turning over her file on Couture.  As such, given the unique, fact-specific circumstances of Dupuis' removal (noted above), we will not weigh the 49 days against the State or Couture in the Factor Two analysis.

¶91    Regarding the subsequent continuances from February 27 to April 24 to June 12 to August 7 (**161 days**), all of those were at the behest of the defense.  As for the reasons for those continuances, Putikka explained that he had another murder trial in March and would be at training in June.  As already noted, however, the fact that defense counsel has a hectic schedule does not in itself constitute good cause for delaying a trial.  *See* ¶ 76, *supra*.  Anciaux and Putikka also explained that more time was needed to conduct

50

further investigations, interview additional witnesses, research additional motions, and otherwise prepare the defense. Yet, for the most part, none of these assertions was backed up with a concrete showing of why the additional time was needed, which was especially important here given that Nistler and Dupuis had already incurred significant delay for the same purposes (investigations, interviews, etc.) and since the court had appointed two attorneys to take Dupuis' place for the express purpose of moving the case quickly to trial. Thus, the 161 days weigh against Couture.

¶92 Couture contends, however, that these continuances can be traced to the State's motion for clarification and, even further back, to the State's loss of the May 17, 2004 search warrant and application. Yet, he was given reasonable time to investigate, research, and address the motion for clarification and the suppression issue. As just noted, no concrete showings of good cause were made for spending an additional five months on the matter.

¶93 Lastly, the delay from the August 7 trial date to the October 30 trial date (**84 days**) was due to the court's second suppression ruling, which clarified that any evidence which was discovered from an independent source or would have been inevitably discovered would not be suppressed. According to Anciaux, this ruling "changed the focus of the defense" and time was needed "to prepare for what we believe the true defense in this is now." Likewise, the prosecutor wanted more time to evaluate the ruling, and to this end he filed another motion for clarification. These 84 days, therefore, are attributable to both the State and the defense as legitimate delay necessary to modify their cases in light of the court's new ruling on the suppression issue.

**3. Sixth Trial Setting (Oct. 30, 2006) to Eighth Trial Setting (Nov. 27, 2006): 28 days**

¶94 Trial had to be postponed from October 30 to November 13 (**14 days**) as a result of the prosecution's Notice of Additional Witnesses. The addition of Emmanual Little Wolf to the prosecution's list of witnesses led Anciaux to withdraw as defense counsel due to a conflict of interest. The District Court correctly attributed this delay to the State as lack of diligence for the following reasons: the court suppressed Couture's statements in its July 17, 2006 suppression ruling, and thus the prosecutor knew as of that date that it might need to call Little Wolf, yet it did not give notice of this fact until October 11 (86 days later, and 19 days before trial); and the prosecution knew or should have known that calling Little Wolf would create a conflict of interest for Anciaux. The State does not dispute this attribution.

¶95 The final trial postponement from November 13 to November 27 (**14 days**) was necessary because two of the State's witnesses were going to be out of state during the week of November 13. The District Court lumped these 14 days together with the State's lack of diligence in not promptly filing notice of Little Wolf, and the State inexplicably does not dispute this attribution on appeal. Nevertheless, our task here is to determine the specific cause and motive for each period of delay, *Ariegwe*, ¶ 67, and delay caused by a missing witness is a valid reason for delay, *Ariegwe*, ¶ 70. Thus, we attribute these last 14 days to the State as valid reasons for delay.

**4. Summary**

¶96 In sum, the State is responsible for 262 days of pretrial delay, which are attributed as follows: 14 days for valid reasons, 91 days for lack of diligence, and 157 days

52

weighted as institutional delay. Couture is responsible for 462 days of delay, which are attributed as follows: 105 days for the first mental health evaluation, 112 days for the second mental health evaluation, 84 days to replace Nistler, and 161 days for further defense preparations. The State and Couture jointly incurred 84 days of valid delay. And lastly, the delay which resulted from having to replace Dupuis (116 days) is not being weighed against either party due to the unique, fact-specific circumstances of her removal and the District Court's efforts to minimize that delay (*see* ¶ 89, *supra*).

¶97 The only delay weighing significantly against the State is the 91-day delay caused by its lack of diligence. The rest of the State's delay was institutional in nature or was for valid reasons. All of Couture's delay was incurred for purposes of defense preparations. Of that delay, we are not persuaded that it was necessary to postpone the omnibus hearing 112 days in order to obtain the second mental health evaluation. Likewise, Couture failed to establish good cause for the 161 days of delay which resulted from continuing the second, third, and fourth trial settings. We therefore conclude that Factor Two weighs strongly against the conclusion that his right to a speedy trial was violated.

## V. Balancing

¶98 We last determine whether the defendant was deprived of his right to a speedy trial in light of the unique facts and circumstances of the case and the weight assigned to each of the four factors discussed above. *State v. Morrisey*, 2009 MT 201, ¶ 73, 351 Mont. 144, 214 P.3d 708. Here, the pretrial delay of 924 days was substantial, and Couture was incarcerated that entire period. Moreover, his anxiety and concern were aggravated by the delay, and his responses to the delays (Factor Three) weigh lightly in his favor. On

the other hand, the conditions of his incarceration were not oppressive, and he requested much of the delay so that he could conduct investigations, interview witnesses, and otherwise prepare his defense. While some of the delay is clearly attributable to the District Court's plea agreement policy and to lack of diligence by the State, we are not persuaded by Couture's attempts to pin most of the delay on these two sources. The record reflects that half the delay in this case was attributable to Couture alone, and a substantial portion of that weighs heavily against him in that it was not supported by concrete showings of good cause. Taking these circumstances together, we hold that Couture's right to a speedy trial was not violated.

## CONCLUSION

¶99 This case demonstrates, unfortunately, what happens when each participant in the criminal justice system fails to meet his or her respective obligations. Cases drag on endlessly from continuance to continuance; evidence and documents are lost; witnesses cannot be located; the accused sits in jail "deteriorating" and becoming increasingly frustrated with counsel; and the prosecution and the defense adopt a "stream of consciousness" approach, raising one issue and resolving that, then raising another and resolving that, followed by another, and then another. Meanwhile, the right to a speedy trial swings aimlessly in the breeze.

¶100 We reiterate that the right to a speedy trial is a fundamental right under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution. *Ariegwe,* ¶ 20; *Barker,* 407 U.S. at 515, 92 S. Ct. at 2184. Accordingly, criminal prosecutions must move at a deliberate pace and with orderly

expedition. *See Ariegwe*, ¶ 91; *Barker*, 407 U.S. at 521, 92 S. Ct. at 2187. It is the obligation of the prosecutor and the court to try the accused in a timely manner, and this duty requires a good-faith, diligent effort to bring him to trial quickly. *Ariegwe*, ¶ 65. It is the obligation of defense counsel to defend the accused, to hold the State to its burden of proof, and to protect the accused's statutory and constitutional rights—including the right to a speedy trial. It is the obligation of the prosecution and the defense to hold each other to the performance of their respective statutory duties in a timely manner. And, most importantly, it is the obligation of the trial court to ensure that the prosecution and the defense fulfill their respective obligations. As the trial judge noted here, it is amazing what counsel can accomplish when the court keeps counsel's back to the wall—and their feet to the fire.

¶101 Based on the foregoing analysis, and on the record before us, we conclude that the District Court did not err in denying Couture's motion to dismiss for violation of his right to a speedy trial.[8]

¶102 Affirmed.

/S/ JAMES C. NELSON

---

[8] Couture notes that while he is asserting his right to a speedy trial under the Montana Constitution, he is asserting his right to a speedy trial under the United States Constitution as well. This Court must guarantee the minimum rights established by the United States Constitution. *See State v. Martinez*, 2003 MT 65, ¶ 51, 314 Mont. 434, 67 P.3d 207. And while our speedy trial test is modeled on the balancing approach set forth by the Supreme Court under the Sixth and Fourteenth Amendments in *Barker*, 407 U.S. 514, 92 S. Ct. 2182, we expressly grounded it in Article II, Section 24 of the Montana Constitution. *See Ariegwe*, ¶¶ 34-35. Nevertheless, Couture has not shown how the analysis would be any different under *Barker* and the United States Constitution.

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JIM RICE

Justice Jim Rice, concurring.

¶103 I concur with the holding of the Court and have thus signed the opinion. However, I believe the attempt to manage the caseloads of the district courts is misguided and thus take issue with the Court's statement that "it is essential that a firm trial date be set at the defendant's arraignment and that a firm trial date be maintained all the way to trial." Opinion, ¶ 74. We have no way of knowing whether this will be possible or practical for every case in every district, and stating such a directive will no doubt fuel challenges to the district court's scheduling decisions, making a difficult task even more so. While the courts must be sensitive to a defendant's speedy trial right, as the District Court was here, "[a] court must always keep control of its own docket." *State v. Garcia*, 2003 MT 211, ¶ 32, 317 Mont. 73, 75 P.3d 313. Scheduling issues should remain the province of the district courts, which we should review for abuse of discretion.

/S/ JIM RICE

Chief Justice Mike McGrath joins the concurring Opinion of Justice Rice.

/S/ MIKE McGRATH